RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0294P (6th Cir.)
File Name: 01a0294p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

UNITED STATES OF AMERICA,
           *Plaintiff-Appellant,*

                v.                                    No. 00-5177

STEVEN EUGENE SMITH,
           *Defendant-Appellee,*

RANDY RAY SMITH,
                    *Defendant.*

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 99-00170—Thomas A. Higgins, District Judge.

Argued: May 3, 2001

Decided and Filed: August 29, 2001

Before: NORRIS and COLE, Circuit Judges;
HOLSCHUH, District Judge.[*]

—————————————

[*]The Honorable John D. Holschuh, United States District Judge for the Southern District of Ohio, sitting by designation.

1

---

**COUNSEL**

---

**ARGUED:**    Van S. Vincent, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellant. Michael J. Flanagan, Nashville, Tennessee, for Appellee. **ON BRIEF:**    Van S. Vincent, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellant. Michael J. Flanagan, Nashville, Tennessee, for Appellee.

---

**OPINION**

---

JOHN D. HOLSCHUH, District Judge.  The government appeals the district court's decision granting Defendant Steven Eugene Smith's motion to suppress evidence obtained as the result of a traffic stop.  On appeal, the government contends that the district court committed two errors.  First, the government argues that the district court erred in concluding that Smith had standing to challenge the search of the rental vehicle he was driving.  Second, the government argues that the district court erred in deciding that the officer who stopped Smith did not have reasonable suspicion to detain Smith after the completion of the traffic stop.  For the reasons set forth herein, we **AFFIRM** the district court order granting Smith's motion to suppress.

## I.  BACKGROUND

On May 13, 1999, Steven Eugene Smith and Randy Ray Smith were traveling eastbound on Interstate 40 through Dickson County, Tennessee, in a white Chevrolet Malibu rental car.  Steven Smith was driving the vehicle and Randy Smith was in the front passenger seat. Officer Chris Fulcher of the 23rd Judicial Drug Task Force was parked on Interstate 40 observing eastbound traffic.  In his patrol car, Officer Fulcher had a trained drug detection dog named Lacy.

## IV. CONCLUSION

We conclude that Officer Fulcher did not have reasonable suspicion of criminal activity sufficient to detain Steven Smith after the completion of the initial traffic stop. Therefore, Steven Smith's detention to allow for the dog sniff was not permissible, and the fruits of that illegal detention must be suppressed. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963). The decision of the district court is **AFFIRMED**.

Around 4:30 a.m., Officer Fulcher observed the Smiths' vehicle traveling at a rate which he perceived to be higher than the posted 70 miles per hour speed limit. Officer Fulcher began following the vehicle, but did not use his radar to ascertain its speed. After observing the vehicle cross onto the shoulder of the road twice within approximately 200 yards, Officer Fulcher stopped the vehicle for failure to maintain lane control.

After stopping the vehicle, Officer Fulcher approached the driver's side of the vehicle. He testified that he suspected that the occupants were driving a rental vehicle. At the suppression hearing, he could not recall if there were markings on the vehicle which indicated that it was a rental, but he stated that rental vehicles are usually white, four-door and untinted, such as this vehicle. When Officer Fulcher arrived at the driver's window, Steven Smith already had the rental agreement out for Officer Fulcher's review. Officer Fulcher asked to see Steven's driver's license.

Officer Fulcher noticed the passenger, Randy Smith, raising the passenger seat from the reclined position to the upright position. According to Officer Fulcher, Randy appeared to be "stoned" and had a white mucus substance around his lips. Officer Fulcher asked Randy if he had been asleep, and he answered that he had just awakened. Officer Fulcher testified that Randy responded with a "real thick tongue" and appeared "stoned" and lethargic. Officer Fulcher noticed several food wrappers and a number soft drink cans strewn about the vehicle and a cooler on the back seat. He also detected a smell of body odor as if the men had not bathed in a couple of days.

While looking over the rental agreement, Officer Fulcher noted that the vehicle was rented from an Alamo Rental Agency in Knoxville, Tennessee, in the name of Tracy Smith, and that neither Steven nor Randy was listed as an authorized driver of the vehicle. Steven informed Officer Fulcher that Tracy Smith was his wife. The address listed by Tracy Smith on the rental agreement matched the address on Steven's

driver's license. Officer Fulcher testified that he was satisfied that Tracy was in fact Steven's wife.

Officer Fulcher noticed that the vehicle had been rented four days earlier on May 9, 1999, and asked the men if they were on vacation. Steven explained that he was a transport driver for a car hauler and that they had been to Arkansas to look at car haulers. Officer Fulcher informed Steven that he was going to issue him a warning citation for failure to maintain lane control. Officer Fulcher then returned to his patrol car to write out the citation. At the preliminary hearing, Officer Fulcher testified that he could not recall if he performed a driver's license check on Steven.

Upon returning to the rental vehicle, Officer Fulcher presented the warning citation to Steven. Officer Fulcher advised him that the next time he rented a vehicle he intended to drive, he should be listed on the rental agreement as an authorized driver. Officer Fulcher then asked Steven if they had any weapons or narcotics in the vehicle. Steven responded in the negative. Officer Fulcher testified that during this questioning, Steven appeared nervous and would not look at him when responding.

Officer Fulcher asked for consent to search the vehicle, but Steven refused. Officer Fulcher then asked Steven and Randy to exit the vehicle so that he could run Lacy, his drug detection dog, around the vehicle. Steven and Randy exited separately from the vehicle and Officer Fulcher patted them down to determine if they were carrying any weapons. According to Officer Fulcher, Steven and Randy were detained at this time and were not free to leave.

After the Smiths exited the vehicle, they waited in front of Officer Fulcher's patrol car as he ran Lacy around the vehicle. The dog alerted to both the passenger's side door and the driver's side door. Officer Fulcher then allowed Lacy to enter the vehicle through the front passenger side of the vehicle. Lacy alerted on a black canvas bag located on the floor

Fulcher doubted Steven's travel plans, because they are generally innocent factors, a conclusion supported by the fact that they did not warrant Officer Fulcher's further investigation at the time. Thus, we are left to consider Steven's nervousness during questions about narcotics and weapons, the body odor emanating from the vehicle, and the unkempt condition of the vehicle. With respect to Steven's nervousness, however, it was minor in degree when compared to that discussed in decisions such as *Erwin* and *Hill*. The food wrappers, soda cans and cooler in the vehicle are factors which have been given little, if any, weight by other courts considering the question of reasonable suspicion, and were consistent with Steven's travel plans. Likewise, the men's body odor receives little weight in our determination.

Even considering all of the government's proffered factors as a whole, we must conclude that Officer Fulcher did not possess a reasonable, articulable suspicion that criminal activity was afoot. *See Wood*, 106 F.3d at 948 ("Reliance on the mantra 'totality of the circumstances' cannot metamorphose these facts into reasonable suspicion"). He was, perhaps, just shy of establishing reasonable suspicion. If he had pursued his initial hunch, and had asked additional questions regarding Steven's rental vehicle or travel plans, or if he had further investigated Randy's condition, then perhaps he would have uncovered a discrepancy or sufficiently nervous behavior, or some other objective, reliable indication of criminal activity. However, given the facts which we have been presented, it appears that the officer, whose primary duty was drug interdiction, may have identified a vehicle and occupants which fit a profile, and based on that, detained Steven after the completion of the traffic stop without developing a reasonable, articulable suspicion of criminal activity. In fact, it seems that it was Steven's refusal of consent to search which triggered Officer Fulcher's decision to use the narcotics dog. That refusal is clearly not an appropriate basis for reasonable suspicion.

ice chest is an item found in many cars making long trips, and thus cannot give rise to reasonable suspicion. *See id.* at \*9.

Clearly body odor and a slovenly vehicle are factors which may indicate perfectly innocent behavior and cannot, standing alone, serve as the grounds for reasonable suspicion. Viewed in conjunction with other relevant, reasonable factors, however, it is possible that they may bolster an argument in favor of reasonable suspicion.

This Court is aware that under the totality of the circumstances test it is possible that "objective facts, meaningless to the untrained" can provide the basis for reasonable suspicion. *See Cortez*, 449 U.S. at 419. However, some factors may be "outrightly dismissed," because they are "so innocent or susceptible to varying interpretations as to be innocuous." *Wood*, 106 F.3d at 946 (internal citation and quotation omitted). As the *Karnes* court stated:

It is possible for factors, although insufficient individually, to add up to a reasonable suspicion - -that is the nature of the totality of the circumstances test. But we think it impossible for a combination of wholly innocent factors to combine into a suspicious conglomeration unless there are concrete reasons for such an interpretation.

*Karnes*, 62 F.3d at 496.

Viewing these factors in the totality of the circumstances, we conclude that Officer Fulcher did not have a reasonable, articulable suspicion of criminal activity sufficient to detain Steven Smith after the completion of the initial traffic stop. Although the government presented several factors which could, under different circumstances, and in combination with other factors, support a finding of reasonable suspicion, under the facts of this case, they merit little, if any, weight in our analysis. We give little weight to Steven's initial nervousness and his prompt presentation of the rental agreement, Randy's "stoned" appearance, the fact that neither Steven nor Randy was listed as an authorized driver, and the fact that Officer

behind the driver's seat.[1] Officer Fulcher opened the bag and discovered illegal drugs wrapped in foil and duct tape. The bag contained what was later determined to be 5854.4 grams of methamphetamine, 436.9 grams of amphetamine and 27.1 grams of cocaine. Officer Fulcher placed Steven and Randy under arrest.

Upon further search of the vehicle, Officer Fulcher discovered a loaded Glock 9mm pistol located next to the passenger seat between the seat and the console. A loaded magazine was found in the glove compartment. Additionally, Officer Fulcher and another officer who had arrived on the scene found gas, hotel and food receipts from San Bernardino, California, dated from May 11, 1999 to May 12, 1999. In the trunk, the officers discovered a set of digital scales, wrapping material used to wrap the drugs and a magic marker. In Randy's front pants pocket, Officer Fulcher found a "shooter pipe" used to ingest narcotics. Subsequent to this arrest, law enforcement officers searched Steven's home and recovered over $21,000 in cash.[2]

On October 6, 1999, Steven Smith and Randy Smith were indicted by the federal grand jury for the Middle District of Tennessee. Count I of the indictment charged the defendants with conspiracy to possess with intent to distribute over 5000 grams of methamphetamine, over 400 grams of amphetamine, and a quantity of cocaine, in violation of 21 U.S.C. § 846. Count II of the indictment charged the defendants with knowingly and intentionally possessing with intent to

---

[1] In its order, the district court stated that the bag was located directly behind the front passenger seat. However, Officer Fulcher testified at the suppression hearing that the bag was found behind the *driver's* seat. No evidence was presented to contradict this testimony.

[2] During the traffic stop, Randy gave the same address as Steven. However, the officers who conducted the search did not find any items belonging to Randy, nor any indication that he resided there. Officer Fulcher testified that the officers believed that Randy did not reside at that address.

distribute 5000 grams of methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count III of the indictment charged the defendants with knowingly and intentionally possessing with intent to distribute over 400 grams of amphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count IV of the indictment charged the defendants with knowingly and intentionally possessing with intent to distribute a quantity of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count V charged the defendants with unlawfully carrying on or about their persons a firearm during and in relation to the commission of drug trafficking crimes, in violation of 18 U.S.C. § 924(c) and § 2.

Both Steven and Randy filed motions to suppress the evidence obtained during the search of the vehicle. The district court granted Steven's motion, but denied Randy's motion, finding that he did not have standing to challenge the legality of the search, because he was a passenger in a rental vehicle and was not listed as an authorized driver of the vehicle, and because he did not assert a possessory interest in any of the contraband seized. The government filed a motion to sever the defendants' cases, which the district court granted, and the case against Randy proceeded to trial. On February 4, 2000, the government filed a notice of appeal with respect to Steven, seeking reversal of the district court's decision granting Steven's motion to suppress.

## II. CERTIFICATION REQUIREMENT

As an initial matter, we must determine whether this appeal should be dismissed because of the government's failure to comply with the certification requirement set forth in 18 U.S.C. § 3731. Section 3731 provides in relevant part:

An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding of an indictment or information, if the United States attorney certifies to the district court

food wrappers and soda cans strewn about the vehicle. He thought this to be suspicious given that the vehicle was a newer model vehicle, which individuals tend to keep more tidy than older model vehicles. The district court found that "a person maintaining a trashy vehicle is not indicative of a violation of the law." *See* J.A. at 122. The government apparently wishes the Court to consider the body odor emanating from the vehicle in conjunction with the condition of the vehicle's interior and conclude that Officer Fulcher had a reasonable articulable suspicion that Steven and Randy had maintained a continuous presence in the vehicle, and therefore were engaged in illegal activity.

In *Karnes v. Skrutski*, 62 F.3d 485, 496 (3rd Cir. 1995), the Third Circuit Court of Appeals considered whether an officer had reasonable suspicion to detain the driver of a vehicle after a traffic stop. One of the factors offered by the government in support of a finding of reasonable suspicion was the presence of fast-food wrappers in the vehicle. The court wrote that fast-food wrappers have "become ubiquitous in modern interstate travel and do not serve to separate the suspicious from the innocent traveler." *Id.* Likewise, in *Wood*, 106 F.3d at 947, the government argued that the presence of fast-food wrappers and open maps in the passenger compartment of a vehicle supported a finding of reasonable suspicion. The *Wood* court concluded that "[r]emnants from fast-food restaurants can probably be found on the floor of many cars traveling the interstate highways," and therefore, the possession of "vestiges of fast-food meals describes a very large category of presumably innocent travelers . . . and any suspicion associated with these items is virtually non-existent." *Id.* (internal citation omitted). In an unpublished opinion, *United States v. Figueroa*, No. 99-6180, 2000 WL 963346 (10th Cir. July 12, 2000), *cert. denied*, 121 S.Ct. 1148 (2001), the Tenth Circuit rejected the government's contention that the presence of food wrappers and an ice chest in a car supported an officer's reasonable suspicion. Relying on *Wood*, the court discounted the presence of the food wrappers, and likewise concluded that an

Officer Fulcher's failure to further pursue this topic distinguishes this case from *Hill*, in which there was at least some discrepancy in the defendants' travel plans. Although inconsistencies in information given to an officer during a traffic stop may give rise to reasonable suspicion of criminal activity, this case is similar to *Mesa*, in which the purported discrepancy in the defendants' travel plans was determined not to be a discrepancy at all. Additionally, even though Officer Fulcher may have thought the length of Steven's trip to be excessive given the stated purpose of the trip, without further questioning Steven about the finer details, Officer Fulcher had nothing more than a hunch. There was nothing inherently implausible about Steven's stated travel plans, unlike the facts presented in *Hill*.

With respect to Randy's appearance, the government argues that Randy had a white mucus around his mouth and appeared lethargic and "stoned." According to the government, this evidence gives rise to a reasonable suspicion of drug activity. The evidence also shows, however, that Officer Fulcher observed Randy moving his seat from the reclined to the upright position, and when asked by Officer Fulcher, Randy responded that he had in fact been asleep. Officer Fulcher pursued this questioning no further, apparently because Randy's response quelled his initial suspicions.

In addition to Randy's appearance, Officer Fulcher noticed an odor emanating from the vehicle as though Steven and Randy had not bathed during the duration of their trip. The district court noted that body odor is not an uncommon event, and found that it is not indicative of criminal activity. The government offers no support for the inclusion of this factor, by itself, in the reasonable suspicion calculus, and the Court has discovered no caselaw discussing body odor in this context. Presumably the government wishes this factor to be viewed in conjunction with the condition of the vehicle's interior.

With respect to the condition of the vehicle's interior, Officer Fulcher noticed a cooler and an excessive amount of

that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding.

\*\*\*\*\*

The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

The provisions of this section shall be liberally construed to effectuate its purposes.

Section 3731 requires the government to certify that the appeal is not taken for the purpose of delay, and that the evidence is a substantial proof of a fact material in the proceeding. The certification is intended to ensure a "conscientious pre-appeal analysis by the responsible prosecuting official." *United States v. Carrillo-Bernal*, 58 F.3d 1490, 1494 (10th Cir. 1995). The purpose of the certification is clearly defeated when the government files its certification after initiating an appeal. *See United States v. Salisbury*, 158 F.3d 1204, 1207 (11th Cir. 1998).

As the Tenth Circuit has noted:

A certification that the appeal has not been taken for the purpose of delay would be a hollow protection for a defendant's right to resolve his or her case quickly if we were regularly to allow prosecutors to wait months before verifying the propriety of their appeals without requiring some explanation for the delay or some showing of why we should accept the late filing of the certificate. Post hoc certification that an appeal was not taken for the purposes of delay reduces the § 3731 requirement to meaningless formality.

*United States v. Hanks*, 24 F.3d 1235, 1239 (10th Cir. 1994).

Although the complete failure to file a certificate would clearly constitute a violation of § 3731 requiring the dismissal

of an appeal, the issue before us is whether the delayed filing of a certificate deprives the Court of jurisdiction. This question presents an issue of first impression in this Circuit.

Our sister circuits have consistently held that the delayed filing of a section 3731 certificate, although disfavored, does not divest appellate courts of their jurisdiction. *See United States v. Romaszko*, No. 00-1580, 2001 WL 686816 at *2 (2nd Cir. June 19, 2001); *In Re Grand Jury Subpoena*, 175 F.3d 332, 337 (4th Cir. 1999); *United States v. Gantt*, 194 F.3d 987, 997 (9th Cir. 1999); *United States v. Smith*, 135 F.3d 963, 967-68 (5th Cir. 1998); *United States v. Salisbury*, 158 F.3d 1204, 1206 (11th Cir. 1998); *United States v. Bailey*, 136 F.3d 1160, 1163 (7th Cir. 1998); *United States v. Shareef*, 100 F.3d 1491, 1499 n. 2 (10th Cir. 1996); *United States v. Carrillo-Bernal*, 58 F.3d 1490, 1492 (10th Cir. 1995); *United States v. Hanks*, 24 F.3d 1235, 1237 (10th Cir. 1994); *United States v. Miller*, 952 F.2d 866, 875 (5th Cir. 1992); *United States v. Becker*, 929 F.2d 442, 445 (9th Cir. 1991); *United States v. Eccles*, 850 F.2d 1357, 1359 (9th Cir. 1988); *United States v. Salinas-Calderon*, 728 F.2d 1298, 1300 (10th Cir. 1984); *United States v. Crumpler*, 507 F.2d 624, 624 (5th Cir. 1975); *Meijer v. Keller*, 521 F.2d 548, 553 (9th Cir. 1975); *United States v. Welsch*, 446 F.2d 220, 224 (10th Cir. 1971).

Instead, a failure to timely file a certificate is an irregularity in perfecting the appeal. *See Salinas-Calderon*, 728 F.2d at 1300; *Hanks*, 24 F.3d at 1237; *Salisbury*, 158 F.3d at 1206. Federal Rule of Appellate Procedure 3(a) governs defects in the filing process, and provides that:

> [a]n appellant's failure to take a step other than the timely filing of a notice of appeal does not affect the validity of the appeal, but is ground only for the court of appeals to act as it considers appropriate, including dismissing the appeal.

Fed. R. App. P. 3(a). Rule 3(a) grants the Court discretion in deciding whether to hear the appeal in light of a defect. *See United States v.Bailey*, 136 F.3d 1160, 1163 (7th Cir. 1998) (citing *Hanks*, 24 F.3d at 1237); *Becker*, 929 F.2d at 445.

given little weight in our analysis. As for Steven's change in demeanor and apparent nervousness during the questioning about narcotics and weapons, these factors carry greater weight in our analysis, given the context in which they arose.

The government also attempts to insert into the reasonable suspicion calculus the fact that neither Steven nor Randy was listed on the rental agreement as an authorized driver. Although under different circumstances this may be a critical factor, in this case, Officer Fulcher was apparently satisfied with the explanation that the authorized driver, Steven's wife, had rented the vehicle and granted Steven permission to use it. Officer Fulcher did not contact the rental company to report the discrepancy, and he could not recall if he performed a check on Steven's driver's license. Moreover, after presenting the warning citation to Steven, Officer Fulcher simply advised him that the next time he rented a vehicle which he intended to drive, he should be listed on the rental agreement as an authorized driver. Officer Fulcher asked no further questions concerning Steven's use of the vehicle, and did not verify the information which he had received from Steven. Clearly, this factor generated little, if any, suspicion in Officer Fulcher's mind at the time, and will be considered accordingly.

With respect to the Smiths' travel plans, Officer Fulcher noticed from the rental agreement that the vehicle had been rented four days earlier, and asked the men if they were on vacation. Steven informed Officer Fulcher that he was a transport driver for a car hauler and that they had been to Arkansas to look at car haulers. Officer Fulcher asked no further questions regarding their travel plans, destination or business.

The district court concluded that if Officer Fulcher had "fleshed out the details concerning the trip to Arkansas better or if he had developed some inconsistencies in their stories, then he may have had some support in establishing a reasonable suspicion of illegal activity." *See* J.A. at 122.

("The test for reasonable suspicion is a totality of the circumstances inquiry. Although we do not analyze each factor in isolation, we will describe these factors separately in order to explain why they were insufficient in the aggregate"). Given that the ultimate determination of whether an officer possessed reasonable suspicion is a question of law which we review *de novo*, we will now consider the factors asserted by the government.

Four of the factors offered by the government relate to Steven's nervousness during the traffic stop. Specifically, the government argues that as his vehicle passed Officer Fulcher's, Steven turned and saw Fulcher and appeared to be scared, that Steven presented the rental agreement to Officer Fulcher before asked to do so, that Steven was nervous when presenting the rental agreement and his license to Officer Fulcher, and that Steven would not look directly at Officer Fulcher when answering questions concerning narcotics and weapons, as he had done when answering other questions, and he became nervous and stuttered when asked for consent to search the vehicle.

The district court relied on the discussion of nervousness found in *Mesa*, and concluded that Steven's nervousness was not suspicious in the context of a 4:30 a.m. traffic stop. Furthermore, the district court found nothing suspicious about the speed with which Steven presented the rental agreement for Officer Fulcher's review.

Nervousness is generally included as one of several grounds for finding reasonable suspicion, and we agree with the district court that there is nothing inherently suspicious about Steven's presentation of the rental agreement, or his initial nervousness during the traffic stop, which occurred at approximately 4:30 a.m. *See United States v. Wood*, 106 F.3d 942, 947 (10th Cir. 1997) ("It is certainly not uncommon for most citizens - - whether innocent or guilty - - to exhibit signs of nervousness when confronted by a law enforcement officer"). Thus, Steven's initial nervousness and his manner of presenting the rental agreement to Officer Fulcher will be

This discretion is consistent with § 3731, which provides that "[t]he provisions of this section shall be liberally construed to effectuate its purposes." *Becker*, 929 F.2d at 445.

In exercising their discretion, courts typically consider a variety of factors, including: when the certificate was filed; the reason for the failure to timely file it; whether the government did in fact engage in a conscientious pre-appeal analysis; whether the government acknowledges that the certification requirement should be taken seriously; any delay or prejudice to the defendant; whether the appeal raises "important legal issues needing appellate clarification;" and whether the appeal should be heard in the interest of justice, or for any other significant reason. *See e.g.*, *Hanks*, 24 F.3d at 1238-39; *Salisbury*, 158 F.3d at 1207 n. 4. No court has established a per se rule that an untimely certificate will automatically result in dismissal of the appeal. *See e.g.*, *Hanks*, 24 F.3d at 1239. Instead, the courts liberally examine the government's explanation for its failure to comply with the requirement. *See id.* Courts are not likely to dismiss an appeal unless the defendant is able to show "actual substantial prejudice." *See id.*

In the case before us, the government filed a notice of appeal on February 4, 2000, but did not file the § 3731 certification until March 26, 2001, after an inquiry from the Court. The government has offered absolutely no explanation for filing the certification over thirteen months after the notice of appeal. We can assume that the failure to timely file the certification was due to "simple negligence," which "cannot excuse noncompliance with the express mandate of the statute." *Salisbury*, 158 F.3d at 1207; *Carrillo-Bernal*, 58 F.3d at 1493. Instead of offering an explanation, the government argues that its January 10, 2000 motion to sever should be construed as compliance with the certification requirement. In that motion, the government averred to the district court:

The court has granted defendant Steven Eugene Smith's motion to suppress the evidence in this matter. Due to

the suppression of the evidence, the United States does not have the ability to proceed to trial against Steven Eugene Smith. Therefore, the United States respectfully requests that the court sever the defendants and that Randy Ray Smith proceed to trial on January 11, 2000.

The government further stated:

Should the court sever Steven Eugene Smith's case from that of Randy Ray Smith and enter the continuance to allow the government the opportunity to analyze the court's memorandum of opinion and determine whether or not an appeal should be taken, the government does not oppose the court setting reasonable conditions of bond relating to Steven Eugene Smith, to affect [sic] his release pending the determination of whether appeal should be taken and the outcome thereof.

According to the government, this motion fulfills the purposes of § 3731 because it informed the court that any appeal taken would involve a substantial issue (in that the government stated that it could not go to trial without the suppressed evidence), that the government would analyze whether an appeal would be appropriate, and that the purpose of any appeal would not be for delay (because the government immediately moved to sever the defendants, so as not to delay the co-defendant's trial). Additionally, to support its assertion that it did in fact engage in a conscientious pre-appeal analysis, the government has provided a copy of a January 26, 2000 memorandum in which the Assistant United States Attorney analyzes the district court's suppression order and requests permission to appeal that decision. Other than this memorandum, the United States Attorney's office has given no indication that it appreciates the § 3731 requirement. *See e.g.*, *United States v. Gantt*, 194 F.3d 987, 997 (9th Cir. 1999); *United States v. Shareef*, 100 F.3d 1491, 1499 (10th

The deputy then questioned Scott, the passenger, who confirmed John's recitation of their travel plans. *See id.* Upon reviewing the rental agreement, the deputy noticed that Scott had paid for the truck in cash. *See id.* While speaking with Scott, the deputy observed a large amount of used tissues on the floorboard of the truck. *See id.* Based on his experience, the deputy believed this to be a sign of cocaine use. *See id.* The deputy asked John if his sister had helped them load the truck before they left California four days earlier. *See id.* When John answered that she had, the deputy asked how this was possible if she were already in Pennsylvania. *See id.* At that point, John became confused and began to stutter while trying to explain the exact details. *See id.* The deputy testified that at this point, he had a reasonable suspicion that a narcotics transfer was being made, based on the inconsistent stories and the nervousness of the men. *See id.* Based upon that suspicion, he presented his narcotics detection dog to the truck, and the dog alerted. A subsequent search of the truck yielded 502 kilograms of cocaine. *See id.* at 263.

The Court concluded that each of the elements which figured into the officer's reasonable suspicion analysis was reasonable, and that when viewed under a totality of the circumstances, using a common sense approach, the officer had formed reasonable suspicion sufficient to justify detention of the defendants beyond the initial traffic stop, in order to allow the canine sniff. *See id.* at 273.

In the case before us, the government argues that the district court incorrectly applied the totality of the circumstances test by individually examining each factor asserted in support of reasonable suspicion. We note however, that the framework of the district court's opinion does not necessarily indicate that the district court failed to apply the test correctly. Although the factors asserted by the government are related, and must be considered as a whole, they also must be examined in some orderly fashion, which typically involves a brief discussion of each factor and its weight in the analysis. *See e.g.*, *Karnes v. Skrutski*, 62 F.3d 485, 495 (3rd Cir. 1995)

defendant's pocket, they discovered a pager, $846 in loose cash, and $135 worth of food stamps. *See id.* After obtaining the defendant's consent, the officer searched the car and discovered one kilogram of cocaine behind the loosened seat cushion. *See id.*

This Court concluded that although many of the facts were consistent with innocence, the officers' suspicion that the defendant was involved in other criminal activity was articulable and reasonable under the totality of the circumstances.

The government specifically directs our attention to *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999), which it argues is most similar to the case *sub judice.* In *Hill*, a sheriff deputy observed a U-Haul truck traveling on the interstate. *See id.* at 261. Although the truck was not speeding at the time, the officer followed the truck to determine whether the driver engaged in a traffic violation, because in his experience, he was aware that such trucks were often used to transport narcotics. *See id.* After following the truck for a short distance, the deputy determined that the truck was exceeding the speed limit, and he stopped the truck. *See id.* The driver of the truck was John Hill, and the passenger was his brother, Scott Hill. *See id.* at 261. The deputy noticed that John's hands were shaking uncontrollably as he handed his license to the deputy. *See id.* The deputy questioned John about their travel plans. *See id.* at 262. John told the deputy that their sister, who was in the military, had been transferred from California to Pennsylvania, and that he and Scott were moving her belongings in the truck. *See id.* He also told the deputy that his sister had flown to Pennsylvania one month earlier. *See id.* The deputy testified that John's statements were very deliberate, as if he had rehearsed the answers regarding the details of the trip. *See id.* The deputy also doubted John's story, based upon his experience that the military usually provides moving services for transfers. *See id.*

Cir. 1996).[3] *See also Carrillo-Bernal*, 58 F.3d at 1494 ("what the United States has really failed to do is demonstrate that it takes Section 3731's certification requirement seriously").

The failure to timely file a § 3731 certification has resulted in the dismissal of appeals in other circuits. In *United States v. Hanks*, 24 F.3d 1235, 1237 (10th Cir. 1994), the court dismissed the government's appeal and wrote:

> [T]he government made no effort to explain why it had not filed the certificate as required, or to suggest why equitable concerns might support hearing this interlocutory appeal or even to acknowledge that the certification requirement in § 3731 should be taken seriously. Rather, all the government did was to assert the obvious, that § 3731 is not a jurisdictional

---

[3]The *Gantt* court noted:

> The United States Attorney's Office for the Southern District of California has shown that despite its mistake, it does take the certification requirements of § 3731 seriously. The Office has described its internal procedures requiring senior officials carefully to review, in light of the requirements of § 3731, each request by a trial attorney for an appeal of a suppression order. The Office has also assured this Court that those procedures were followed in the present case, that the failure to provide the certification was a clerical error, and that those procedures are being reinforced as a result of this error. Given the serious attention the United States Attorney appears to be devoting to this issue, we do not dismiss the appeal. Moreover, though the government's oversight has lead to a considerable waste of judicial resources, the defendant has suffered no prejudice.

*Gantt*, 194 F.3d 987. In *Shareef*, the government timely filed the § 3731 certification, but it was incomplete, because it failed to certify that the evidence was a substantial proof of a material fact. The government corrected the error in an amended notice of appeal filed shortly thereafter. The defendant moved to dismiss the appeal based on the incomplete certification. On appeal, the United States Attorney filed an affidavit representing that the government undertook the analysis required by the statute, and the court declined to dismiss the appeal. *See Shareef*, 100 F.3d at 1499 n. 2.

requirement - - as if the only obligations the government need obey are jurisdictional obligations.

*See also Carrillo-Bernal*, 58 F.3d at 1497 ("Both *Hanks* and this case reflect this court's determination that we do not ask too much of government attorneys, in their exercise of that right, to slow down long enough to conduct their evaluation in a manner and at a time that are consistent with Section 3731's history and the important interests that the certification requirement was designed to protect").

The Eleventh Circuit has likewise dismissed an appeal for failure to comply with the certification requirement. In *United States v. Salisbury*, 158 F.3d 1204, 1207 (11th Cir. 1998) the court dismissed an appeal of a suppression order, because the government filed the certificate one month after the notice of appeal, and only at the behest of the clerk. Finding that the "purpose of Section 3731's requirement is thwarted when the government certifies the propriety and weight of its appeal after it has initiated the appeal," the court concluded that "absent some compelling justification," it would decline to hear such appeals. *Id.* at 1207.

As for prejudice to the defendant, Smith argues that he has suffered the harm of delay, and that pre-trial release is a deprivation of liberty. The government argues that Smith never objected to the government's failure to comply with the certification requirement, and that there has been no indication or allegation that the appeal is being pursued for the purpose of delay. In *Salisbury*, the government argued that the defendant had suffered no harm from any delay because he was not incarcerated during the pendency of the appeal. The *Salisbury* court rejected the government's argument and concluded that "pre-trial release is still a deprivation of liberty and the burden of an impending trial weighs heavy on the mind of the accused." *Salisbury*, 158 F.3d at 1207.

Finally, as for the legal issues raised in this appeal, we find that given the facts of this case, the issue of Smith's standing to challenge the evidence, in light of the existing case law on

some set of circumstances nervousness alone might give an officer sufficient reasonable suspicion to justify further detention, it concluded that in the case before it, the defendant's nervousness was not suspicious, and under the circumstances, was likely "the norm rather than the exception." *See id.* at 163. Therefore, the deputy lacked reasonable suspicion to detain the defendant after the purpose of the initial traffic stop was complete.[5]

In *United States v. Erwin*, 155 F.3d 818 (6th Cir. 1998), sheriff deputies received a general police broadcast regarding a drunk or reckless driver, which provided descriptions of the vehicle and the driver, as well as the vehicle's license plate number. *See id.* at 820-21. A deputy subsequently spotted a vehicle and driver matching this description at a truck stop. *See id.* at 821. The driver had pulled over to use a pay phone, and attempted to leave upon seeing the police. *See id.* After questioning the driver, the deputies were satisfied that he was not under the influence of drugs or alcohol. *See id.* However, during the questioning, they noticed that the driver, who was "wearing a jogging suit, gym shoes and a lot of jewelry," was extremely nervous and sweating profusely. *See id.* His eyes were darting around, he repeatedly took his hat off and ran his hand through his hair, and he kept reaching into his pocket. *See id.* In the car, which he had borrowed from a friend who had rented it, the deputies noticed a cellular phone, a small mirror, and an object they believed at the time to be a cocaine spoon. *See id.* They thought it strange that the defendant would stop to use a pay phone when he possessed a cellular phone. *See id.* The deputies also noticed that a seat cushion in the back seat was ajar and positioned higher than normal. *See id.* The deputies conducted a pat down, and in the

---

[5]The government argues that *Mesa* was subsequently limited to its facts by *United States v. Guimond*, 116 F.3d 166 (6th Cir. 1996). Although *Guimond* did limit *Mesa* to its facts, it did so only with respect to the issue of the validity of consent to search which is obtained after the conclusion of an initial detention. *See Guimond*, 116 F.3d at 171. *Guimond* did not affect *Mesa* with respect to the issue of reasonable suspicion.

the factor was not sufficient to give rise to a reasonable articulable suspicion of illegal activity. The government argues that the district court erred in the application of these standards, by analyzing each factor individually, rather than as a whole, and in failing to analyze the factors from the perspective of a law enforcement officer.

The issue before this Court is whether the district court properly applied the totality of the circumstances standard to the facts of this case. We review the legal determination of reasonable suspicion *de novo*. *See United States v. Ornelas*, 517 U.S. 690, 697 (1996); *Houston v. Clark County Sheriff Deputy John Does 1-5*, 174 F.3d 809, 813 (6th Cir. 1999). The parties direct our attention to *United States v. Mesa*, 62 F.3d 159 (6th Cir. 1995), *United States v. Erwin*, 155 F.3d 818 (6th Cir. 1998) and *United States v. Hill*, 195 F.3d 258 (6th Cir. 1999).

In *United States v. Mesa*, 62 F.3d 159 (6th Cir. 1995), a sheriff deputy initiated a traffic stop after determining that the defendant was speeding. During routine questioning, the defendant told the deputy that she and her sister, who was the passenger in the car, were going to Nashville to visit their grandfather who had recently suffered a stroke. *See id.* at 160. Although the defendant's sister confirmed their destination, when asked if anything was wrong with their grandfather, or if he had suffered a heart attack or some other medical problem, she replied, "He's just old." *See id.* at 161. The government argued that this discrepancy and the nervousness of the defendant and her sister were sufficient to give rise to reasonable suspicion.

This Court found that the discrepancy regarding the defendant's grandfather was not sufficient to generate reasonable suspicion in the mind of a reasonable police officer. *See id.* at 162. With respect to the defendant's nervousness, the Court noted that nervousness is generally included as one of several grounds for finding reasonable suspicion and is not sufficient in and of itself. *See id.* Although the Court did not rule out the possibility that under

this subject, is a significant legal issue which this Court should address.

Although this Court would be entirely justified in dismissing this appeal, we decline to do so. Although pre-trial release is a deprivation of liberty, Steven Smith has not shown substantial prejudice beyond that deprivation, and has not alleged that the appeal is being pursued for delay. Weighing in favor of entertaining the appeal is the fact that the government apparently did engage in the type of deliberative pre-appeal analysis § 3731 requires, and the fact that this Court has not yet squarely addressed one of the two issues before us in this case, whether an unauthorized driver of a rental vehicle may have standing to challenge a search of the vehicle. However, in exercising our discretion not to dismiss this appeal, we do not condone the United States Attorney's failure to file the certificate. Although we decline to establish a bright line rule that henceforth all appeals will be dismissed for failure to comply with § 3731, we do reemphasize the importance of the certification requirement, and the critical role it serves in the criminal justice system. Further, we hereby serve notice to the United States Attorneys in this Circuit that henceforth, we will not hesitate to dismiss appeals in the event the government fails to satisfy the certification requirement.

## III. DISCUSSION

## A. STANDARD OF REVIEW

"This Court reviews the district court's factual findings in a suppression hearing for clear error, and reviews the district court's conclusions of law *de novo*." *United States v. Waldon*, 206 F.3d 597, 602 (6th Cir.), *cert. denied*, 121 S.Ct. 193 (2000); *United States v. Guimond*, 116 F.3d 166, 169 (6th Cir. 1997), *cert. denied*, 530 U.S. 1268 (2000); *United States v. Bradshaw*, 102 F.3d 204, 209 (6th Cir. 1996); *United States v. Dotson*, 49 F.3d 227, 229 (6th Cir. 1995). A factual finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made. *See United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir.

1993).   The government urges the Court to consider the findings of fact in the light most favorable to the government. However, the Court considers the evidence "in the light most likely to support the district court's decision." *Guimond*, 116 F.3d at 169 (quoting *United States v. Roark*, 36 F.3d 14, 16 (6th Cir. 1994)). The standard advocated by the government is appropriate only in cases where the district court has *denied* a motion to suppress. *See e.g.*, *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998), *cert. denied*, 525 U.S. 1123 (1999) ("When reviewing the *denial* of a motion to suppress evidence, the appellate court must consider the evidence in the light most favorable to the government") (citing *United States v. Shamaeizadeh*, 80 F.3d 1131, 1135 (6th Cir. 1996)) (emphasis added).

A defendant's Fourth Amendment standing and the existence of reasonable suspicion are questions of law which this Court reviews *de novo*. *See United States v. Pollard*, 215 F.3d 643, 646 (6th Cir.) *cert. denied*, 121 S.Ct. 498 (2000) (standing);  *United States v. Ornelas*, 517 U.S. 690, 697 (1996) (reasonable suspicion).

## B.  STANDING

The government argues that Smith lacks standing to challenge the search of the rental vehicle because he was not an authorized driver of the vehicle, he was not given permission by the owner to drive the vehicle, and he did not claim a possessory or proprietary right in the vehicle or its contents.

Although this issue is presented as whether Smith has standing to challenge the search, we recognize that the Supreme Court rejected the concept of "standing"  in *Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978). *See Pollard*, 215 F.3d at 646-47; *United States v. Sanchez*, 943 F.2d 110, 113 n.1 (5th Cir. 1991). "[I]n determining whether a defendant is able to show the violation of his . . . Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.'" *Minnesota v. Carter*, 525 U.S.

The district court addressed nine factors offered by the government in support of a finding of reasonable suspicion: (1) as Smith's vehicle passed Officer Fulcher's, Smith turned and saw Fulcher and appeared to be scared; (2) Smith was nervous when he produced his driver's license and the rental agreement; (3) Smith presented the rental agreement for Officer Fulcher's inspection before asked to do so; (4) Randy appeared to be stoned and had a white mucus around his mouth; (5) Officer Fulcher detected a smell of body odor as if the men had not bathed in a couple of days; (6) neither of the defendants was listed on the rental agreement as an authorized driver; (7) Officer Fulcher thought the length of the Smiths' trip was excessive for the purported purpose of the trip; (8) there was an excessive amount of food wrappers and other trash strewn about the car, which was a 1999 model; and (9) Steven would not look at Officer Fulcher when answering questions concerning narcotics and weapons, and he became nervous and stuttered when asked for consent to search the car. *See* J.A. at 118-19.

In granting Smith's motion to suppress, the district court concluded that Officer Fulcher did not have reasonable suspicion to detain Smith after the completion of the traffic stop.  The district court said:

"The [c]ourt finds that the factors articulated by Officer Fulcher do not establish an articulable, reasonable suspicion of illegal activity.  Perhaps, if Officer Fulcher had fleshed out the details concerning the trip to Arkansas better or if he had developed some inconsistencies in their stories, then he may have had some support in establishing a reasonable suspicion of illegal activity."

*See* J.A. at 122.

The district court correctly recognized that the factors asserted as the basis for reasonable suspicion must be viewed under the totality of the circumstances, as understood by those in the field of law enforcement.  The court discussed each factor individually, and for each, reached the conclusion that

government argues that the district court erred in its determination that the search violated the Fourth Amendment.

In *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000), this Court wrote that "[o]nce the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable, articulable suspicion that criminal activity was afoot." *See also United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995) ("Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention"). Reasonable suspicion requires specific and articulable facts, which, taken together with rational inferences from those facts, reasonably warrant the continued detention of a motorist after a traffic stop. *See Terry v. Ohio*, 392 U.S. 1, 21 (1968).

We determine whether an officer formed the requisite reasonable, articulable suspicion during a traffic stop under a "totality of the circumstances" analysis. *See United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc), *cert. denied*, 525 U.S. 1123 (1999). This means that we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989). "Reasonable suspicion is more than an ill-defined hunch; it must be based upon a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). The evidence offered as grounds for reasonable suspicion is to be viewed using a common sense approach, as understood by those in the field of law enforcement. *See Cortez*, 449 U.S. at 417-18; *Hill*, 195 F.3d at 272.

83, 88 (1998) (quoting *Rakas*, 439 U.S. at 140). As the Fifth Circuit noted in *Sanchez*, 943 F.2d at 113 n.1:

> Technically, the concept of "standing" has not had a place in Fourth Amendment jurisprudence for more than a decade, since the Supreme Court in *Rakas v. Illinois*, indicated that the mater of standing in the context of searches and seizures actually involved substantive Fourth Amendment law. The Court thus dispensed with standing as a "discrete analytic element apart from the merits" in such cases, instead requiring a defendant to prove a legitimate expectation of privacy as a prerequisite to challenging assertedly unlawful police conduct. We therefore use the term "standing" somewhat imprecisely to refer to this threshold substantive determination.

(internal citations and quotations omitted).

In the present case, we also use "standing" to refer to the threshold substantive determination of whether Smith has a reasonable expectation of privacy under the Fourth Amendment.

Thus, in order to determine whether Smith may challenge the seizure as a violation of the Fourth Amendment, we must determine first, whether he had an actual, subjective expectation of privacy, and second, whether that expectation was a legitimate, objectively reasonable expectation. *See Smith v. Maryland*, 442 U.S. 735, 740 (1979); *Pollard*, 215 F.3d at 647. "Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas*, 439 U.S. at 143 n.12.

Smith has the burden of establishing his standing to assert a Fourth Amendment violation. *See United States v. Salvucci*, 448 U.S. 83, 86 (1980); *United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988), *amended by* 866 F.2d 147 (6th Cir. 1989). We review for clear error the district court's findings

of fact regarding Smith's standing to challenge the alleged Fourth Amendment violations. *See Pollard*, 215 F.3d at 646 (citing *United States v. Rohrig*, 98 F.3d 1506, 1511 (6th Cir. 1996)). We review the district court's legal determination of standing *de novo. See id.*

The district court concluded that Smith had standing to challenge the search of the vehicle, based on the specific facts of this case. Smith personally contacted the rental car company, Alamo, and reserved the vehicle in his name, using his own credit card, which was billed for the rental. His wife, Tracy Smith, picked up the vehicle and furnished the agent with the reservation number which was given to Smith. Tracy presented her driver's license and signed the rental agreement. Smith was driving the vehicle at the time of the stop, and held a valid driver's license. Tracy Smith, the lawful renter of the vehicle, and an individual with whom Smith had an intimate relationship, had given Smith permission to drive the vehicle.

The government argues that based upon the law of this Circuit and the weight of authority regarding unauthorized drivers of rental vehicles, we must reverse the district court's determination that Smith had standing to challenge the search. We disagree.

We note from the outset that much of the authority the government urges us to follow concerns the Fourth Amendment rights of passengers in vehicles and rental vehicles. *See e.g., Rakas v. Illinois*, 439 U.S. 128 (1978); *United States v. Dunson*, 940 F.2d 989 (6th Cir. 1991); *United States v. Pino*, 855 F.2d 357 (6th Cir. 1988).[4] Although we

---

[4] In *Rakas*, 439 U.S. at 148, the Supreme Court held that passengers in a vehicle driven by the owner of the vehicle did not have a legitimate expectation of privacy, because they asserted neither a property nor a possessory interest in the vehicle, nor an interest in the property seized. In *Dunson*, 940 F.2d at 994-95, this Court found that a passenger in a borrowed vehicle who, with the driver, had participated in borrowing the car from its owner, had a legitimate expectation of privacy in the vehicle. Finally, in *Pino*, 855 F.2d at 360-61, this Court held that a passenger in a rental vehicle who was not a licensed driver and was not listed as an

---

and the driver admitted that he did not even have the renter's permission to drive it. Additionally, the *Riazco* court was concerned with establishing a rule which would lead to "absurd" results in cases in which neither the driver nor the passenger is listed as an authorized driver, but because they are driving in turns, the individual who has the luck to be driving at the time of the stop will have standing to challenge a search, while the individual who is the passenger at the time will not. The case before us is distinguishable from *Riazco* in that the vehicle was not overdue, and Smith had the authorized driver's permission to drive the vehicle. Furthermore, the *Riazco* court's concern with rendering Fourth Amendment rights dependent on one's position in a rental vehicle at the time of a traffic stop is not applicable in this case, because Steven and Randy did not have the same status with respect to the vehicle. Even if Randy had been driving at the time of the stop, it is unlikely that he would have standing to challenge the search, given his attenuated relationship to the vehicle. Steven Smith had a business relationship with the rental company, he paid for the vehicle, he was given permission to use the vehicle by the sole authorized driver of the vehicle, his wife, and he was driving the vehicle at the time of the stop. At that point, Steven could exclude all others except for the owner of the vehicle, the rental car company, and his wife, the sole authorized driver of the vehicle.

In light of the circumstances surrounding Smith's use of the rental vehicle, we hold that Smith had standing to challenge the legality of the search which resulted from his prolonged detention subsequent to the traffic stop.

## C. LEGALITY OF THE DETENTION

In his motion to suppress, Smith did not contest the legality of the initial traffic stop. Instead, he argued that upon the completion of the traffic stop, Officer Fulcher had not formed the requisite reasonable and articulable suspicion of criminal activity to detain him for any purpose beyond the scope of the initial traffic stop. The district court agreed. On appeal, the

card number, and that credit card was subsequently billed for the rental of the vehicle. His wife, Tracy Smith, picked up the vehicle using the confirmation number given to Smith by the company. Smith had an intimate relationship with Tracy Smith, the authorized driver of the vehicle who gave him permission to drive it. This is not a case in which a driver was simply granted permission by the "renter" of the vehicle, because in this case Smith was the *de facto* renter of the vehicle. His relationships to the vehicle and its authorized driver were not "attenuated" as were the relationships in *Obregon*, *Sanchez*, *Wellons* and *Muhammad*. Although Smith was not technically in privity of contract with the rental company as was the driver in *Cooper*, he did have a business relationship with the company. His business relationship with the rental company and his intimate relationship with his wife, the authorized driver of the vehicle, are relationships which are recognized by law and society. Based on these relationships, as well as the fact that he personally paid for the vehicle, Smith had both a subjective and an objective legitimate expectation of privacy.

Although Smith's use of the vehicle was clearly a breach of the agreement with Alamo, it does not follow that he has no standing to challenge the search. It was not *illegal* for Smith to possess or drive the vehicle, it was simply a breach of the contract with the rental company. Regarding Smith's operation of the vehicle, Officer Fulcher testified at the suppression hearing that "It's not illegal for him to drive it. It's against their [Alamo's] policy for him to be in possession of that vehicle." *See* J.A. at 81. The breach of the contract with Alamo does not foreclose Smith's standing to challenge a constitutional violation.

We recognize that in *Riazco*, the Fifth Circuit rejected the argument that because an unauthorized driver's use of rental vehicle is merely a breach of contract, and not illegal possession of the vehicle, that individual may have standing to challenge a search of the vehicle. *See Riazco*, 91 F.3d at 754. We disagree with that decision. In *Riazco*, the rental vehicle was five days overdue for return to the rental company

may refer to these decisions for their discussion of rental vehicles and rental agreements in relation to a legitimate expectation of privacy, they do not control our determination of Smith's standing, because they do not address the Fourth Amendment rights of drivers of rental vehicles, the class to which Smith belongs.

Our only opportunity to address an issue similar to that before us now was an unpublished decision, *United States v. Frederickson*, No. 90-5536, 1990 WL 159411 (6th Cir. Oct. 22, 1990). In *Frederickson*, a state highway patrol officer stopped a Ryder rental van. The defendant was in the passenger's seat at the time of the stop, but later testified that she and a co-defendant had switched seats, and that she in fact had been driving at the time of the stop. She also testified that she had rented and paid for the van, although she neither reserved it in her name nor picked it up. Although the Court could not determine whether she was in fact an unauthorized driver or a passenger at the time of the stop, the Court concluded that Frederickson did not have standing:

> Frederickson has failed to establish a legitimate expection of privacy in the van. She was either a passenger . . . or an unauthorized driver . . . who did not have a license on her person, when the van was stopped. Williams was the only authorized driver of the van; he rented the van and only his name appears on the rental agreement.
>
> Even assuming that Frederickson paid to rent the van, she still does not have standing. Her name was not on the rental agreement . . . and she did not have a driver's license on her person.

*Frederickson*, 1990 WL 159411 at *2-3 (citations omitted).

---

authorized driver of the vehicle, did not have a legitimate expectation of privacy sufficient to challenge the legality of the search of the vehicle.

Other circuits have considered facts more similar to those presented in the instant case, and a brief review of those decisions will be helpful to our analysis.

In *United States v. Obregon*, 748 F.2d 1371 (10th Cir. 1984), the defendant was the driver of a rental vehicle. The vehicle's license plates were expired, and the defendant's name was not on the rental agreement as either the renter or an authorized driver. *See id.* at 1373-74. An "unrelated third party" arranged the rental of the vehicle. The court of appeals affirmed the district court's determination that the defendant's relationship to the rental vehicle was "too attenuated to support a claim of standing." *Id.* at 1374.

In *United States v. Boruff*, 909 F.2d 111(5th Cir. 1990), the defendant's girlfriend rented a vehicle in her name, and gave it to the defendant to drive. The defendant was not listed on the rental agreement as an authorized driver. The court concluded that defendant did not have a legitimate expectation of privacy because his girlfriend was the only legal operator of the vehicle, and she had no authority to give control of the car to the defendant. *See id.* at 117. The court relied on the rental agreement's express prohibition on using the vehicle for illegal purposes, and the defendant's awareness of these restrictions at the time he took possession of the vehicle. *See id.*

In *United States v. Kye Soo Lee*, 898 F.2d 1034 (5th Cir. 1991), the defendants, who were the driver and the passenger of a Ryder rental truck, had been hired by the renter of the truck to drive it from Texas to New York. The government argued that the defendants did not have standing to contest the search of the truck's cargo hold because they did not rent the truck, did not claim a possessory interest in the contraband discovered in the cargo hold, and claimed not to know that they could unlock the door to the cargo hold. *See id.* at 1038. The court of appeals held that because the defendants were operating the truck with the renter's permission, they had standing to challenge the search. *See id.* The court did not

surrounding circumstances. *See Rakas*, 439 U.S. at 152 (Powell, J., concurring). "In considering the reasonableness of asserted privacy expectations, the [Supreme] Court has recognized that no single factor invariably will be determinative." *Id.* We believe that the facts of this case are truly unique, and thus it is not governed by the general rule regarding unauthorized drivers of rental vehicles.

Like the defendants in many of the cases discussed above, Smith was not listed as an authorized driver of the rental vehicle. However, upon consideration of the totality of the circumstances, we find that Smith's case is distinguishable from those cases. First, Smith was a licensed driver, unlike the drivers in *Frederickson* and *Best*, and the passenger in *Pino*, who were not licensed drivers. Therefore, it was not illegal for Smith drive the vehicle. Second, Smith was able to present the rental agreement and provided the officer with sufficient information regarding the vehicle, unlike the drivers in *Sanchez*, and *Wellons*. Third, Smith was given the vehicle by his wife, who was listed as the authorized driver. This is not a situation such as those presented in *Obregon*, *Sanchez* and *Wellons* where the vehicle was rented by some "unrelated third party," about whom the driver could provide little or no information. Fourth, Smith's wife had given him permission to drive the vehicle. Although the *Boruff*, *Sanchez* and *Wellons* courts have held that permission of the authorized driver is not sufficient to give an unauthorized driver standing to challenge a search, other courts have indicated that permission from the authorized driver or renter may be sufficient. *See Muhammad*, 58 F.3d 353; *Riazco*, 91 F.3d at 754-55; *Best*, 135 F.3d at 1125. *See also Lee*, 898 F.2d 1034 (holding that both the driver and passenger of a rental vehicle had standing because they were operating the vehicle with the renter's permission).

Fifth, and most significantly, Smith is unlike any of the drivers in any of these cases, because he personally had a business relationship with the rental company. Smith called the rental company to reserve the vehicle and was given a reservation number. He provided the company with his credit

discuss the rental agreement or the rights of the defendants as unauthorized drivers.

In *United States v. Sanchez*, 943 F.2d 110 (1st Cir. 1991), the defendant, who had a valid driver's license, borrowed a vehicle from his friend, Nana, which belonged to Nana's friend Penta. However, the defendant was unable to provide a full name, addresses or telephone number for either Nana or Penta. *See id.* at 112. The district court found that "at best the defendant was operating the vehicle with the authority of a person who himself had been given the authority to operate the vehicle by somebody else." *Id.* at 113. The court of appeals set forth a list of factors to be considered in determining standing:

> ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case.

*Id.* The court found that the defendant had only casual possession of the car, there was no evidence that he had used the car on other occasions, and he did not have direct authority from the owner to use the vehicle. *See id.* at 114. The court concluded that if the defendant had demonstrated a "more intimate relationship with the owner," or a history of regularly using the vehicle, it would have "been likely to conclude that the totality of the circumstances established a legitimate expection of privacy." *Id.*

In *United States v. Wellons*, 32 F.3d 117 (4th Cir. 1994), the defendant was stopped for exceeding the speed limit. Although he produced a valid driver's license, he could not produce the rental agreement for the rental vehicle, which was rented by an individual named Dixon. *See id.* at 118. The state trooper contacted the rental company to verify this information. The rental company confirmed that the defendant was not listed as an authorized driver, and

In *United States v. Best*, 135 F.3d 1223 (8th Cir. 1998), the Eighth Circuit noted, without deciding, that an unauthorized driver of a rental vehicle would have standing if the renter of the vehicle had granted him permission to use the vehicle. In *Best*, the defendant was driving a vehicle rented by his friend Thomas. The defendant's driver's license had been suspended, and so the trooper had the automobile towed, and marijuana was discovered during an inventory search of the vehicle. *See id.* at 1124. The district court did not make a factual determination as to whether the defendant had permission to use the car. Thus, the court of appeals remanded the case for a factual determination as to *whether the defendant had the renter's permission to use the vehicle*, and as a result, standing to challenge the search. *See id.* at 1125 (emphasis added).

Finally, in *United States v. Cooper*, 133 F.3d 1394 (11th Cir. 1998), the defendant was the authorized driver of a rental vehicle which was four days overdue for return to the rental company. The government argued that the defendant's rights were "functionally equivalent" to those of an unauthorized driver at the time of the search. *See id.* at 1400. The court disagreed and held that the defendant had a legitimate expectation of privacy, because although the contract was in breach at the time of the search, the defendant and the rental company were in privity of contract. *See id.* According to the court, this factor distinguished the defendant from the driver in *Wellons*, who had never been in privity of contract with the rental company.

We acknowledge that as a general rule, an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle, and therefore does not have standing to contest the legality of a search of the vehicle. However, we refuse to adopt a bright line test, as the government seems to advocate, based solely on whether the driver of a rental vehicle is listed on the rental agreement as an authorized driver. Such a rigid test is inappropriate, given that we must determine whether Smith had a legitimate expectation of privacy which was reasonable in light of all the

requested that the trooper impound the car. *See id.* at 118-19. The district court found that as an unauthorized driver of a rental vehicle, the defendant had no legitimate expectation of privacy. *See id.* at 119. The court of appeals affirmed, and noted that although the defendant may have had the renter's permission to drive the vehicle, he did not have the permission of the rental company, the owner of the vehicle. *See id.* at n. 2.

In *United States v. Muhammad*, 58 F.3d 353 (8th Cir. 1995), the defendant was stopped while driving a rental vehicle rented to Candace Jordan. Jordan was the only authorized driver listed on the rental agreement. The court noted that the defendant had to "present at least some evidence of consent or permission from the *lawful owner/renter* to give rise to a legitimate expectation of privacy," and concluded that the defendant failed to present any evidence of consent or permission from either. *Id.* at 355 (emphasis added). Thus, the defendant lacked standing to assert a Fourth Amendment violation.

The Fifth Circuit confronted this issue again in *United States v. Riazco*, 91 F.3d 752 (5th Cir. 1996). In *Riazco*, the defendants were the driver and the passenger of a rental vehicle. Neither the defendant nor the passenger was listed on the rental agreement as an authorized driver, and the vehicle was five days overdue for return to the rental company. The agreement specified that the vehicle was not to be used for illegal activity. The district court ruled that the driver, but not the passenger, had standing to challenge a search under these circumstances:

> Permitting use by one who is not named in the contract is not illegal. It simply supplies the basis for cancellation of the agreement. Therefore, any person with a license and apparent authority is a legal operator [,] particularly as between the operator and a third party, such as the police. After all it is not a crime to drive a lease [sic] car without the permission of the rental agency.

*Id.* at 754. Thus similar to our case, the district court granted the driver's motion to suppress, but denied the passenger's motion.

The court of appeals reversed the trial court's order granting the driver's motion to suppress, holding that neither the driver nor the passenger had standing to challenge the search. The court wrote:

> Riazco, the driver of the car, did not assert a property or possessory interest in the vehicle. He neither owned nor rented it. The rental agreement specifically stated that the car was to be driven only by persons authorized by the car rental company, and Riazco was not so authorized. In fact, *he admitted at the suppression hearing that he did not even have the renter's permission to drive it.*
>
> *****
>
> We have already held that, "[t]ypically, a passenger without a possessory interest in an automobile lacks standing to complain of its search because his privacy expectation is not infringed."
>
> *****
>
> There is no logical reason to adopt a different rule for a driver simply because he happens to be behind the wheel when the car is stopped.

*Id.* at 754-55 (emphasis added). In a footnote, the court continued:

> Adopting a different rule for drivers would lead to absurd results. For example, suppose two people were driving in turns. Under a rule protecting drivers and not passengers, the Fourth Amendment protection would depend on who was driving.

*Id.* at 755 n. 4.