RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0298P (6th Cir.)
File Name: 02a0298p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
  *Plaintiff-Appellant,*

  *v.*     No. 01-5438

CHARLES DALE BAILEY,
  *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 00-00022—Thomas G. Hull, District Judge.

Argued: August 6, 2002

Decided and Filed: September 4, 2002

Before: MOORE and GILMAN, Circuit Judges; ROSEN,[*]
District Judge.

_____

## COUNSEL

**ARGUED:** Dan R. Smith, ASSISTANT UNITED STATES ATTORNEY, Johnson City, Tennessee, for Appellant. Mark D. Edmonds, EASTRIDGE & EDMONDS, Johnson City,

_____

[*]The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

Tennessee, for Appellee.  **ON BRIEF:**  Dan R. Smith, ASSISTANT UNITED STATES ATTORNEY, Johnson City, Tennessee, for Appellant.  Mark D. Edmonds, EASTRIDGE & EDMONDS, Johnson City, Tennessee, R. Jackson Rose, Harrogate, Tennessee, for Appellee.

————————

**OPINION**

————————

KAREN NELSON MOORE, Circuit Judge.  Appellant United States appeals the district court's grant of Appellee's motion to suppress.  Appellee Charles Dale Bailey ("Bailey") was indicted for carrying certain firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(B)(i), and for possessing firearms as a convicted felon, in violation of 18 U.S.C. § 922(g).  Bailey was arrested following searches of both his person and his car.  He moved to suppress the evidence obtained in the searches, claiming that the initial stop of his car and the subsequent searches violated his Fourth Amendment rights.  A magistrate judge recommended that Bailey's motion be denied, but the district court granted the motion.  For the following reasons, we **REVERSE** the district court's grant of Bailey's motion to suppress and we **REMAND** for proceedings consistent with this opinion.

## I. BACKGROUND

In the late evening and early morning of September 5 and 6, 1999, Police Officer Todd Davidson ("Davidson") and Police Captain Jerry Graham ("Graham") of the Morristown, Tennessee Police Department were investigating complaints of drug trafficking at the Royal Mobile Home Trailer Park in Morristown.  According to Graham, the police were "making traffic stops where we'd get some probable cause to make the stop, if a traffic violation, of vehicles leaving the scene where they were, [sic] had the trailer under surveillance."  Joint Appendix ("J.A.") at 59 (Graham Test.).  Davidson and Graham were exiting the trailer park when they encountered

## III. CONCLUSION

For the foregoing reasons, we **REVERSE** the order of the district court granting Bailey's motion to suppress and we **REMAND** for proceedings consistent with this opinion.

————————

positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance.") (citation omitted).  Furthermore, once Graham saw the gun in Bailey's pocket, it is clear that the officers had probable cause to search Bailey's person.  *See United States v. Thomas*, 11 F.3d 620, 628 (6th Cir. 1993), *cert. denied*, 511 U.S. 1043 *and* 511 U.S. 1044 (1994) (seeing gun handle under driver's seat provided probable cause for police officers to arrest defendant on charges of carrying a concealed weapon).

activity. Bailey testified that when Davidson approached his car, he simply reached to get his driver's license. Because the district court granted Bailey's motion to suppress, this court must view the facts in the light most favorable to Bailey. *Smith*, 263 F.3d at 581. Even viewing the facts in the light most favorable to Bailey, we believe that Bailey's "reaching" in the context of the surrounding circumstances could have been legitimately perceived as threatening. When Davidson approached Bailey's car, it was dark, criminal activity had been going on in the area, and Davidson knew that Bailey might be armed and dangerous. Given this totality of circumstances, we conclude that Davidson had sufficient reasonable suspicion to detain Bailey following the initial stop of Bailey's car.

Assuming that the basis for a *Terry* stop was proper, then we must determine "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Garza*, 10 F.3d at 1245 (quotation omitted). In response to Bailey's "reaching," Davidson ordered Bailey out of the car and detained him for less than two minutes, until the arrival of the drug-sniffing dog. We have held that "[i]n a situation where the officers have reason to believe the occupants of a car are armed and dangerous, officers certainly may . . . order occupants out of a car." *Id*. at 1246 (quotation omitted). And although, as the district court noted, Davidson did not restrain Bailey or pat him down after he got out of the car, the detention of less than two minutes does not appear to be an unreasonable intrusion considering Bailey's potentially threatening behavior in the car. Therefore, we conclude that Davidson had sufficient reasonable suspicion under *Terry* to detain Bailey following the initial traffic stop and until the arrival of the drug-sniffing dog.[7]

---

[7] Once the drug-sniffing dog arrived and alerted to areas in Bailey's car, it is clear that the police officers had probable cause to search the car. *See United States v. Diaz*, 25 F.3d 392, 393-94 (6th Cir. 1994) ("A

Bailey; Davidson testified that Bailey's car entered the trailer park on the wrong side of the road, and Graham, who was driving the car, testified that Bailey's car "about hit me head on." J.A. at 60. Bailey testified that although the police car was "hogging" most of the narrow entrance road into the trailer park, "there was still enough room for me to go by." J.A. at 81 (Bailey Test.). After the cars passed each other, Davidson shouted at Bailey to stop his car; and when Bailey did not immediately stop his car, Davidson got out of the police car and pursued Bailey's car on foot.[1] Davidson testified that he stopped the car "[b]ecause it had turned in on our side of the road and I wasn't sure if [Bailey] was intoxicated or not." J.A. at 48 (Davidson Test.).

Bailey eventually stopped his car, and Davidson approached the driver's side of the car to talk to Bailey. According to Davidson, "Bailey kept reaching into the floorboard where he was seated in the vehicle, which [sic] he was the driver." J.A. at 49 (Davidson Test.). Davidson first asked Bailey to keep his hands to himself, and later Davidson asked Bailey to step out of the car. J.A. at 49 ("I asked him to step out of the vehicle because I was really nervous and, and I was aware that he, you know, was known to carry weapons, and which he did, he stepped out of the vehicle.").[2] Graham and Police Officer Dan Cox ("Cox") reached the scene soon thereafter, and with Davidson and Bailey they waited for Police Officer Chris Wisecracker ("Wisecracker") to bring in a drug dog. Wisecracker arrived in less than two minutes, and proceeded to "run the dog on the vehicle." J.A. at 50. While the dog sniffed for drugs in the car, Graham noticed that Bailey had put his hand in his pocket. Graham asked Bailey to remove his hand, and when Bailey did remove his hand, Graham saw the butt of a gun. The police officers

---

[1] Graham also testified that when Davidson recognized Bailey, he "hollered, you know, that's him . . . ." J.A. at 60 (Graham Test.).

[2] Davidson also testified that "we had an informant came [sic] to us personally, talked to me and Mr. Cox, told us that he, Mr. Bailey, had made threats on our life [sic]." J.A. at 57 (Davidson Test.).

on the scene then handcuffed and arrested Bailey. Immediately after Bailey was arrested, Cox, in an effort to calm Bailey down, told Bailey that "everything would be okay." J.A. at 75 (Cox Test.). To this statement, Bailey allegedly responded "no, everything won't be okay. There's three ounces of cocaine in the car." J.A. at 75. The search of the car, following the drug dog's alert in two areas, did in fact yield two more guns and three ounces of cocaine.[3]

Bailey was indicted by a grand jury in the Eastern District of Tennessee on February 24, 2000, and a Superseding Indictment was entered against him by the same grand jury on September 27, 2000. The indictment charged Bailey with two counts: (1) knowingly and intentionally carrying certain firearms during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(B)(i); and (2) possessing firearms as a convicted felon in violation of 18 U.S.C. § 922(g). On December 12, 2000, Bailey moved to suppress the evidence obtained in the search of the car and the search of his person. He alleged that the initial stop of his car, his arrest, and the searches were all in violation of his Fourth Amendment rights. On December 19, 2000, a magistrate judge held a hearing on the motion, and on December 20, 2000, he issued a report and recommendation to deny the motion to suppress. On March 9, 2001, however, the district court granted Bailey's motion to suppress. The court found that "the officers' actions [in stopping and searching Bailey] were not justified at their inception, and their actions were not reasonably related in scope to the circumstances which justified the interference in the first place . . . ." J.A. at 45 (Mem.). Therefore, the court concluded that "the search incident to [the initial] stop was in violation of the defendant's Fourth Amendment rights." J.A. at 46. The government timely appeals.

---

[3]The gun on Bailey's person turned out to be unloaded.

We emphasize that "courts must carefully scrutinize an officer's stated reasons for detaining [an] individual beyond the purpose of [a traffic] stop to insure that the reasons rise to the level of reasonable suspicion, so that the officer does not abuse his authority under *Whren*." *Hill*, 195 F.3d at 267. However, we conclude that Bailey's behavior immediately following the traffic stop in conjunction with the surrounding circumstances independently gave rise to sufficient reasonable suspicion under *Terry* to justify Bailey's detention beyond the effectuation of his traffic stop.

Under *Terry*, a law enforcement officer may briefly stop and detain an individual for investigative purposes if he has a reasonable suspicion supported by articulable facts that "criminal activity may be afoot," even if he lacks probable cause. *Erwin*, 155 F.3d at 822 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). We evaluate the legitimacy of *Terry* stops by engaging in a two-part analysis of the reasonableness of the stop. First, we must determine "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) (quotation omitted). The Supreme Court has recently reiterated that courts must look at the "totality of the circumstances" in making reasonable-suspicion determinations. *United States v. Arvizu*, 122 S. Ct. 744, 750 (2002). However, "an officer's reliance on a mere 'hunch' is insufficient to justify a stop." *Id*. at 751 (quoting *Terry*, 392 U.S. at 27).

Davidson testified that Bailey "kept reaching into the floorboard" when Davidson approached Bailey's car immediately following the initial stop. J.A. at 49 (Davidson Test.). This behavior on the part of Bailey made Davidson "really nervous" because Davidson knew that Bailey was "known to carry weapons" and that Bailey had made threats on Davidson's life. J.A. at 49; 57. In addition, the initial stop of Bailey's car took place at one o'clock in the morning at the Royal Mobile Home Trailer Park — a known area of criminal

initial interference." *Id.* (citing *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996) (quoting *Terry*, 392 U.S. at 20)). "Once the purposes of the initial traffic stop [are] completed, there is no doubt that the officer [can] not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995); *see also United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (en banc), *cert. denied*, 525 U.S. 1123 (1999) ("when a law enforcement officer no longer has any reasonable suspicion of criminal activity, the detained individual is constitutionally free to leave").[6]

In this case, the purposes of the traffic stop were never accomplished. The district court found "it undisputed that the officers at the scene did not pursue the initial stop in any manner." J.A. at 43 (Mem.). The officers themselves testified that they were making "traffic stops" just to look for other illegal activity. *See, e.g.*, J.A. at 59, 65 (Graham Test.) ("We were making traffic stops where we'd get some probable cause to make the stop, if a traffic violation . . . ,", and "[w]e were stopping the ones that was [sic] coming back into town for taillight violations, or any, you know, PC [probable cause] we could come up with, find."); J.A. at 41 (Mem. description of Wisecracker Test.) ("I was asked to assist in the narcotics and vice division to make traffic stops. They were watching or doing surveillance on an area that they had information on for drug traffic. I was asked to stop vehicles, if I found probable cause to stop them, as they left the area.").

---

**6** This standard applies even if a drug-sniffing dog arrives within a few minutes of the completion of the traffic stop. *See Hill*, 195 F.3d at 270 (asking "whether Deputy Whitlock had a reasonable suspicion that Defendants were engaged in criminal activity so as to detain them beyond the purpose of the traffic stop — i.e., so as to allow Deputy Whitlock to detain Defendants for the approximately *one or two minutes* it took Spanky [the drug-sniffing dog] to run the search of the vehicle" (emphasis added)).

## II.  ANALYSIS

### A.  Standard of Review

We review de novo the district court's legal conclusions in a suppression hearing, and we review the district court's findings of fact for clear error. *United States v. Smith*, 263 F.3d 571, 581 (6th Cir. 2001). "A factual finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made." *Id.* (citation omitted). Where the district court grants a motion to suppress, this court views the evidence in the light most favorable to the defendant. *Id.* ("[T]he Court considers the evidence in the light most likely to support the district court's decision." (quotation omitted)).

### B.  Initial Stop of Bailey's Car

The district court concluded that the initial stop of Bailey's car by Davidson and Graham was not justified because it was "a pretext." J.A. at 46 (Mem.). By this, the court seems to have meant that although Davidson and Graham ostensibly stopped Bailey for a traffic violation — driving on the wrong side of the road while possibly intoxicated — they really stopped Bailey for other reasons. The court emphasized the portion of Graham's testimony in which he explained that the police were "making traffic stops" at the trailer park, where they had probable cause. The court also cited this court's opinion in *United States v. Huguenin*, 154 F.3d 547, 559 n.10 (6th Cir. 1998), for the proposition that "[a] pretextual stop occurs when the police use a legal justification to make a stop . . . in order to search a person or his vehicle, or interrogate him, for an unrelated and more serious crime for which they do not have the reasonable suspicion necessary to support a stop." J.A. at 34.

It is well established, however, that an officer's actual motivation for making a traffic stop is irrelevant to the constitutionality of that stop. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("these cases foreclose any argument that the constitutional reasonableness of traffic stops depends

on the actual motivations of the individual officers involved"); *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000) (citing *Whren* and explaining that pursuant to that decision, "an officer may stop a vehicle for a traffic violation when his true motivation is to search for contraband, as long as the officer had probable cause to initially stop the vehicle"); *see also United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (en banc), *cert. denied*, 513 U.S. 828 (1994). Therefore, it is irrelevant in this case whether Davidson's and Graham's initial stop of Bailey was "pretextual."[4]  The relevant question on this appeal is whether Davidson and Graham had probable cause to stop Bailey for a traffic violation.

We conclude that Davidson and Graham did have probable cause to stop Bailey for a traffic violation. Although the district court's findings of fact in this case simply consisted of excerpts of testimony from the suppression hearing, the court did label as "findings of fact" Davidson's and Graham's testimony that they stopped Bailey because he was driving on the wrong side of the road and Davidson's testimony that Bailey also seemed to be intoxicated. In a section of the opinion entitled "application of the law to the facts," the court later concluded that certain other facts "undermine the alleged reason for the 'traffic stop.'" J.A. at 44 (Mem.). But the court does not appear in this section to question the existence of a traffic violation; the court simply concluded that the traffic violation was not the real reason for the stop. Moreover, the magistrate judge who presided over the suppression hearing specifically proposed a finding that Davidson's and Graham's testimony regarding the traffic

---

[4] In the portion of *Huguenin* cited by the district court, "pretext" is defined as the use of a legal justification by the police, in particular, the use of a checkpoint, to make a stop for which the police do not otherwise have the requisite reasonable suspicion. *See Huguenin*, 154 F.3d at 559 n.10. The *Huguenin* court explained that "*without a traffic violation or reasonable suspicion of drug trafficking*, it was a violation of the Fourth Amendment for the police to selectively detain motorists with out-of-state tags . . ." *Id.* at 558 (emphasis added).

violation was credible, and the district court did not reject this finding. J.A. at 15 (Report and Recommendation) ("At this juncture, the issue is purely one of credibility; who is to be believed — Officers Graham and Davidson, or the defendant? To put it succinctly, the officers are believed, and the defendant is not.").[5]  This court has held that "[w]e are generally reluctant to set aside credibility determinations made by the trier of fact, who has had the opportunity to view the witness on the stand and assess his demeanor." *Peveler v. United States*, 269 F.3d 693, 702 (6th Cir. 2001).

## C. Detention of Bailey After the Initial Stop

Having concluded that Davidson and Graham had probable cause initially to stop Bailey for a traffic violation, we must then ask whether the officers had sufficient reasonable suspicion to detain Bailey after the purposes of the traffic stop had been accomplished. We have held that "[a]n ordinary traffic stop . . . is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry v. Ohio*, 392 U.S. 1 (1968), apply to define the scope of reasonable police conduct." *Hill*, 195 F.3d at 264. Therefore, "any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the

---

[5] We note that it is an open question in this circuit whether a district court can reject a magistrate judge's credibility determinations without holding a new hearing. The Supreme Court has noted in dicta that:

> The issue is not before us, but we assume it unlikely that a district judge would *reject* a magistrate's proposed findings on credibility when those findings are dispositive and substitute the judge's own appraisal; to do so without seeing and hearing the witness or witnesses whose credibility is in question could well give rise to serious questions which we do not reach.

*United States v. Raddatz*, 447 U.S. 667, 681 n.7 (1980) (emphasis in original). Other circuits have held that district courts must hold new hearings in order to reject the proposed credibility findings of a magistrate judge if the rights of criminal defendants would be implicated. *See, e.g., Hill v. Beyer*, 62 F.3d 474, 482 (3d Cir. 1995); *Grassia v. Scully*, 892 F.2d 16, 19-20 (2d Cir. 1989); *Louis v. Blackburn*, 630 F.2d 1105, 1109 (5th Cir. 1980).