**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0409n.06
Filed: July 9, 2008

No. 07-3095

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | **ON APPEAL** FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE SOUTHERN |
| v. | ) | DISTRICT OF OHIO |
| | ) | |
| DIONNE D. TURNER, | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | **O P I N I O N** |
| | ) | |

Before: DAUGHTREY and MOORE, Circuit Judges; DUGGAN,* District Judge.

**KAREN NELSON MOORE, Circuit Judge.** A jury convicted Defendant-Appellant Dionne D. Turner ("Turner") of robbing a bank in Evendale, Ohio, in violation of 18 U.S.C. § 2113(a) and (d), and brandishing a firearm while committing a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). The district court sentenced Turner to consecutive terms of 224 months and 84 months of imprisonment respectively. Turner appeals the district court's denial of his motion to suppress evidence of a jacket containing a substantial amount of money found in his girlfriend's car after the robbery at issue. Also, Turner appeals the denial of his motion to exclude a boot print found on a bank countertop at the scene of the crime. In addition, Turner appeals three evidentiary rulings made by the district court during his trial that he contends constitute cumulative error

_____

*The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation.

warranting a retrial. Finally, Turner appeals the denial of his motion for judgment of acquittal at the close of the evidence. For the following reasons, we **AFFIRM** the district court's judgment.

## I. BACKGROUND

**A. Factual Background**

**1. The Robbery**

On October 31, 2002, a gunman robbed the Fifth Third Bank located on Saint Rita Lane in Evendale, Ohio. He entered the bank shortly after it opened, yelling profane statements. He vaulted the bank tellers' countertop and demanded currency in fifty and one-hundred dollar denominations. He grabbed the hair of customer-service representative Michelle Angus ("Angus"), and forced her to the floor. The robber held a gun to Angus's head as another customer-service representative, Maher Kaddoura ("Kaddoura"), put money into a blue bag provided by the robber. Kaddoura testified that the robber wore "Timberland-kind of shoes, kind of bulky shoes." Joint Appendix ("J.A.") at 363 (Kaddoura Test. at 1-163:8-9). Despite the fact that much of the robber's face was covered, two bank employees, Kelly Fisher ("Fisher") and Kaddoura, testified that the robber had a tattoo under one eye. After collecting the blue bag filled with money by Kaddoura, the robber went through a swinging teller door (instead of vaulting the counter again) and exited the building. Customer-service representative Fisher set off the alarm. Kaddoura wrote down the license-plate number of the getaway car and noted that an umbrella had been left between the bank's front doors. Customer-service representative Sandy Crone ("Crone") and personal banker Marcia Wood ("Wood") were also present during the robbery.

2

## 2. The Vehicle Search

On November 8, 2002, Officer Jeffrey Ray ("Ray"), along with other officers, approached a parked car after Turner had exited the passenger side and entered a building. The record is clear that this was not a "traffic stop." J.A. at 254 (Ray Test. at 94:11). The driver of the car was Turner's girlfriend at the time, Alyscia Stone-Knight ("Stone-Knight"). Stone-Knight signed a consent form, and the officers proceeded "to search the vehicle for contraband." J.A. at 248 (Ray Test. at 88:7). Ray took notes during the search. The officers recovered two items of note during the search: a "blue nylon Tommy Hilfiger bag," J.A. at 249 (Ray Test. at 89:25), in the "back seat" of the vehicle, J.A. at 250 (90:5), and "a black leather jacket . . . in the rear" of the vehicle. J.A. at 250 (Ray Test. at 90:9-10). A pocket of the leather jacket contained "a large amount of U.S. currency," J.A. at 250 (Ray Test. at 90:17), in "large denominations, fifties and one hundreds." J.A. at 251 (Ray Test. at 91:6-7). Ray testified that he did not ask Stone-Knight to whom the jacket belonged, but he did not think that it belonged to her because of its size; indeed, Ray believed that the jacket belonged to Turner. Ray also testified that the search uncovered "some small amount of marijuana." J.A. at 567 (Ray Test. at 2-197:12-14).

## 3. The Boot Print

During the course of the robbery, the suspect left a boot print on a piece of glass at a teller window; officers observed the suspect vaulting the countertop when they examined the bank's surveillance photos. Officers removed the glass and sent it to a Federal Bureau of Investigation ("FBI") lab for testing. Fingerprint specialist Derrick Weems ("Weems") testified that the lab followed a specific protocol for examining evidence. Weems testified that when he saw the boot print on the glass, he sent it to the "Questioned Documents" department because the process that he

3

would employ to lift fingerprints would likely destroy the boot print. J.A. at 102 (Weems Test. at 58:2-6). Weems testified that once the shoe-print analysis had been completed, the glass was returned to him and he examined it for fingerprints. Weems testified that his fingerprint examination destroyed the boot print.

Michael Smith ("Smith"), a forensic examiner with the FBI, conducted tests on the boot print. He testified that photography was part of the shoe-print analysis, and that one could perform the analysis by examining the shoe itself and a proper photograph of the print. Smith testified that forensic photography provides the best quality lift for a shoe print on a piece of glass. When asked why an electrostatic lift had not been his preferred method of examining the boot print, Smith replied that, although the electrostatic lift was a method generally accepted by the scientific community, he chose not to use the electrostatic lift because it could have damaged the fingerprint evidence on the glass.[1] Smith testified that he did not know of a method, aside from the one that he used, to lift the boot print and still preserve any existing fingerprints. In addition, he testified that if he had known that fingerprints would not need to be lifted after his examination and if the photograph that he received from the forensic photographers "was not the quality that [he] wanted" J.A. at 179-80 (Smith Test. at 19:25-20:11), he might have used the electrostatic lift. Smith testified that he was sure, based on four points of comparison, that the positive identification between the boot submitted to him and the print on the glass was "one hundred percent accurate." J.A. at 181 (Smith Test. at 21:19-21). Smith testified that the average number of points of comparison that allowed him to make a positive match was between four and seven.

---

[1]Defense counsel tried to establish that Smith could not have been sure that fingerprints existed on the glass. Smith testified that he assumed that there were probably latent prints because the glass had been sent to him by the Latent Print Unit.

The defense expert, Garry Koverman ("Koverman"), examined both the boot and the forensic photograph of the glass imprint; he made his own test impression of the boot for purposes of his analysis. He concluded that Smith's first three points of comparison were "significant points of identification." J.A. at 240-41 (Koverman Test. at 81:23-82:10). When asked if the electrostatic lift "improves on the quality of what you have to view," Koverman stated that "[i]t is not a hard-fast rule, but, generally, I would say yes." J.A. at 219 (Koverman Test. at 59:9-14). The defense expert also testified that the photograph of the shoe that was taken "looked okay," but that he would have taken more photographs "in the search for more characteristics." J.A. at 226 (Koverman Test. at 66:1-5). In addition, he testified that it was not a reasonable scientific choice for the government lab to fail to perform a lift of the boot print. The electrostatic lift "could have increased the detail that could be seen," J.A. at 227 (Koverman Test. at 67:21), which would have "increased the chances of identification and also exclusion." J.A. at 227-28 (Koverman Test. at 67:25-68:1). Koverman testified that the failure to conduct an electrostatic lift "could have" affected the reliability of Mr. Smith's opinion but that he did not "know that." J.A. at 228 (Koverman Test. at 68:2-10). Finally, Koverman testified that he did not think that the four points of comparison were "sufficient to make an identification." J.A. at 233 (Koverman Test. at 73:3-7).

## B. Procedural Background

A grand jury indicted Turner for robbing a branch of the Fifth Third Bank in Evendale, Ohio, in violation of 18 U.S.C. § 2113(a) and (d), and for brandishing a firearm while committing a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A). Approximately one month before trial, Turner filed two motions. First, Turner sought to exclude evidence of a boot print found on the glass countertop at the bank (or, alternatively, to dismiss the indictment). Second, Turner moved to

5

suppress evidence recovered during a search of Smith-Knight's car and residence. The district court held a hearing on August 14, 2006, and denied both motions orally. After the close of all of the evidence, Turner orally moved for a judgment of acquittal under FED. R. CRIM. P. 29; the district court denied the motion. A jury convicted Turner on both counts. The clerk entered the district court's judgment on January 22, 2007, and Turner filed a timely appeal the same day.

## II. ANALYSIS

### A. Denial of Motion to Suppress

#### 1. Standard of Review

"We review de novo the district court's legal conclusions in a suppression hearing, and we review the district court's findings of fact for clear error." *United States v. Bailey*, 302 F.3d 652, 656 (6th Cir. 2002). "'A factual finding is clearly erroneous when the reviewing court is left with the definite and firm conviction that a mistake has been made.'" *Id.* (quoting *United States v. Smith*, 263 F.3d 571, 581 (6th Cir.2001)). Because the district court denied the motion to suppress, we view the evidence in the light most favorable to the government. *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). In addition, we consider a constitutional error to be "harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Mitchell v. Esparza*, 540 U.S. 12, 17-18 (2003) (internal quotation marks omitted). As the Supreme Court held in *Kotteakos v. United States*, 328 U.S. 750 (1946), "if one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Id.* at 765; *United States v. Haywood*, 280 F.3d 715, 724 (6th Cir. 2002) (quoting *Kotteakos*, 328 U.S. at 765).

6

## 2. Motion to Suppress Jacket and Money Found Within It

We first consider the issue of whether the district court erred by denying Turner's motion to suppress the jacket, containing fifty and one-hundred dollar bills, that officers found on the backseat of his girlfriend's vehicle. We have held that the suppression hearing's central inquiry involves determining, on a case-by-case basis, whether the defendant has "'a legitimate expectation of privacy in the place searched or the thing seized.'" *United States v. Waller*, 426 F.3d 838, 843 (6th Cir. 2005) (quoting *United States v. King*, 227 F.3d 732, 743 (6th Cir. 2000)). We recognize several exceptions to the warrant requirement, including consent. *United States v. Caldwell*, 518 F.3d 426, 429 (6th Cir. 2008). When someone other than the defendant consents to a search of the defendant's belongings, that third party must have actual common authority[1] or apparent authority[2] over the property the officers seek to examine in order to give legal consent. "The government bears the burden of establishing the effectiveness of a third party's consent." *Waller*, 426 F.3d at 845.

We need not determine today whether the district court should have suppressed the jacket and its contents found by police on the backseat of Smith-Knight's car after she gave consent to a search of her vehicle for (what Officer Ray described as) "contraband." J.A. at 248 (Ray Test. at 88:7). Even if we agreed with Turner that the district court erred by denying the motion to suppress

---

[1]Common authority "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974). Those who have common authority with respect to a certain object or place "have assumed the risk that one of their number might permit" a search. *Id*.

[2]Apparent authority becomes relevant when an individual represents to government officials that he or she has actual common authority, but in reality does not have such authority. Under these circumstances, we consider the consent given by an individual who claims to have apparent authority to be valid if "the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises." *Ill. v. Rodriguez*, 497 U.S. 177, 188 (1990) (internal quotation marks omitted).

the jacket and money (because Smith-Knight did not have actual common or apparent authority to give consent to a search of the jacket), we hold that such an error would be harmless. One cannot say that the jury's findings were "substantially swayed," *Kotteakos*, 328 U.S. at 765, by the admission of the jacket and the money found in one of the jacket's pockets because these items were only a small part of the evidence that could have led the jury to find Turner guilty. First, it is important to note that the money found in the jacket pocket was not the only evidence presented to the jury indicating that, after the robbery, Turner possessed the same denominations of money—fifty and one-hundred dollar bills—taken *during* the robbery. Indeed, Smith-Knight testified that, after the date of the robbery, Turner gave her fifty and one-hundred dollar bills to use towards the purchase of a new vehicle. Smith-Knight testified that this was abnormal because Turner rarely had money and did not have a job during the five months preceding the bank robbery. We note that defense counsel took the opportunity thoroughly to cross-examine Smith-Knight. In addition, the jury could have considered evidence indicating that Turner had the same tattoo under one of his eyes as the robber, had boots that matched the boot print left by the robber on one of the bank's glass countertops, and had presented bank employees with a bag to fill with money that Smith-Knight later identified as the diaper bag that she had given Turner to use when looking after her children. Viewing the above evidence in a light most favorable to the government, *Blair*, 524 F.3d at 748, we hold that, even if we were to conclude that the district court improperly denied the motion to suppress the jacket and the money found in one of the jacket's pockets, any such error was harmless because we can say with fair assurance that the judgment was not swayed by such an error.

**B. Denial of Motion to Exclude Boot-Print Evidence**

**1. No Denial of Due Process Rights**

Turner claims that the district court violated the Due Process Clause by denying his motion to exclude the evidence of the boot print left by the robber on the bank's countertop because he was denied the opportunity to examine the boot print and then demonstrate that the boot print did not belong to him. "Under the Due Process Clause, the Supreme Court has developed 'what might loosely be called the area of constitutionally guaranteed access to evidence.'" *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (quoting *Cal. v. Trombetta*, 467 U.S. 479, 485 (1984)). In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id*. at 87. In order for evidence to be "material," it "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Trombetta*, 467 U.S. at 488-89. Thus, the Supreme Court established in *Trombetta* that states have a constitutional duty "to preserve evidence . . . that might be expected to play a significant role in the suspect's defense." *Id*. at 488.

Four years after *Trombetta*, the Supreme Court distinguished material exculpatory evidence from "potentially useful" exculpatory evidence in *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). *Youngblood* established that "the government does not have 'an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution.'" *United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001) (quoting

9

*Youngblood*, 488 U.S. at 58). "[T]he Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Youngblood*, 488 U.S. at 57. In order for a court to hold that the government violated a defendant's due-process rights with regard to potentially useful exculpatory evidence, the defendant must show that the government acted in "bad faith." *Id*. at 58. A showing that the government was negligent, even grossly negligent, is insufficient to establish bad faith. *Wright*, 260 F.3d at 571.

We conclude that the boot print is not material exculpatory evidence as defined in *Trombetta* because the exculpatory nature of the boot-print evidence was not apparent before its destruction. *Trombetta*, 467 U.S. at 488-89. At the district court level, Turner argued that "appropriate testing *may have* provided exculpatory evidence." J.A. at 31 (Mot. to Exclude Hr'g at 7) (emphasis added). Indeed, none of the testimony elicited from the defense expert, Koverman, indicated that there was anything about the boot print that would have caused its alleged exculpatory nature to be apparent. In fact, Koverman testified that his preferred method of analysis would only have brought out more details that "could have increased the chances of identification and also exclusion." J.A. at 228 (Koverman Test. at 67:25-68:1). Koverman did not testify that the exculpatory nature of the evidence should have been apparent to the government, only that more tests "might have exonerated" Turner. *Youngblood*, 488 U.S. at 57. Thus, the boot print was not material exculpatory evidence under *Trombetta*.

We must analyze next whether the boot-print evidence qualifies as "potentially useful" under *Youngblood*. Because Turner has not shown "bad faith" on the part of the government, as required by *Youngblood*, suppression of the boot-print evidence would have been improper. Although Turner

10

argues that the government displayed bad faith in his case similar to that found in *United States v. Bohl*, 25 F.3d 904 (10th Cir. 1994), Turner's case is distinguishable from *Bohl*. In *Bohl*, the government deliberately destroyed evidence that was central to its case—despite the fact that the defendants had previously requested access to the evidence—and there was independent evidence indicating that the materials may have had exculpatory value. In addition, the evidence that the government presented to the defense for testing in *Bohl* was not of sufficient size to allow proper chemical testing and the government admitted that the photographs it had taken of the evidence were of no use to the defendants. In contrast, in Turner's case the testing and destruction of the evidence occurred *before* Turner was indicted in 2005; thus, he did not have an opportunity to request separate testing of the evidence before its destruction. Also, the photograph taken in this case, unlike the photograph in *Bohl*, was part of the method of forensic analysis. The FBI used the photograph taken by a forensic photographer and a test impression of the boot to determine whether the print on the glass plate matched that of Turner's boot. Because it was not apparent after testing that the boot-print evidence was exculpatory and because the "conduct" of the police does not "indicate that the evidence could form a basis for exonerating the defendant," *Youngblood*, 488 U.S. at 58, destruction of the boot-print evidence during the fingerprint analysis does not indicate bad faith on the part of the government. Therefore, bearing in mind that we must view the above facts in the light most favorable to the government, we conclude that the district court properly denied the motion to exclude the boot-print evidence because the boot print was not material exculpatory evidence under *Trombetta* and was not destroyed in bad faith in violation of *Youngblood*.

## 2. Reliability of Boot-Print Analysis

Turner also appeals the district court's denial of his motion to exclude based on the alleged unreliability of the government expert's boot-print analysis. In the seminal case, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court "established the standard for admissibility of scientific expert testimony under Federal Rule of Evidence 702."[3] *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 907 (6th Cir. 2004), *cert. denied*, 544 U.S. 975 (2005). Because *Daubert* requires that "'any and all scientific testimony or evidence admitted [be] not only relevant, but reliable,'" *id.* (quoting *Daubert*, 509 U.S. at 589), a court must first assess "whether the reasoning or methodology underlying the testimony is scientifically valid and [] whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (quoting *Daubert*, 509 U.S. at 592-93). Expert testimony, however, need not be "unassailable." *United States v. Mahone*, 453 F.3d 68, 72 (1st Cir. 2006) (quotation omitted). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596 (citation omitted). *Daubert* provides us with a "non-exclusive checklist of factors" to employ when "assessing the reliability of scientific expert testimony." *United States v. Beverly*, 369 F.3d 516, 528 (6th Cir. 2004). The factors include:

---

[3]Federal Rule of Evidence 702 states:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
FED. R. EVID. 702.

1) whether the expert's scientific technique or theory can be, or has been, tested; 2) whether the technique or theory has been subject to peer review and publication; 3) the known or potential rate of error of the technique or theory when applied; 4) the existence and maintenance of standards and controls; and 5) whether the technique or theory has been generally accepted in the scientific community.

*Id.* (citing *Daubert*, 509 U.S. at 592-95; *Hardyman v. Norfolk & W. Ry.*, 243 F.3d 255, 260 (6th Cir.2001)).

We conclude that the district court did not abuse its discretion by admitting the testimony of the government expert regarding boot-print analysis. Turner asks us to focus on assessing the reliability of the government expert's analysis. Both the government expert, Smith, and the defense expert, Koverman, testified that photographic analysis was recognized as a valid method of shoe-print analysis within the scientific community. In addition, Smith testified that the government lab methods were tested by an independent agency once during the year, and that he had never failed a proficiency test. Also, the government presented evidence indicating that a book entitled *Footwear Impression Evidence* by William J. Bodziak stated that "[p]ositive identifications may be made with as few as one random identifying characteristic." J.A. at 185 (Smith Test. at 25:19-20). Based on the above, we conclude that the district court did not abuse its discretion in determining that the government expert's testimony met the *Daubert* standard and FED. R. EVID. 702.

We do not find persuasive Turner's arguments that the electrostatic method should have been used, and that the four points of comparison used by the government expert were insufficient to conclude that the boot and the print on the glass matched. In short, the government and defense experts disagreed as to whether the photographic or the electrostatic method would be *better* to use on the boot print at issue—*not* whether the photographic method was a valid method, tested and accepted by the larger scientific community. In addition, the record reveals that the experts also

13

disagreed about the number of points of comparison necessary for a positive match between the boot and the print. These disputes go to the weight of the evidence rather than its admissibility.

In sum, Turner's arguments regarding the appropriate boot-print analysis method and the necessary number of points of comparison involve differences of opinion between the experts that the jury must weigh, not a court. *See Champion*, 380 F.3d at 900. Therefore, we conclude that the district court did not abuse its discretion by admitting the government expert's testimony regarding the analysis of the boot print.

## C. Cumulative Error: Denial of a Motion for Mistrial and Admission of Alleged Hearsay

### 1. Standard of Review

We review the district court's admission or exclusion of evidence and its denial of a motion for mistrial for abuse of discretion. *United States v. Davis*, 514 F.3d 596, 611 (6th Cir. 2008). However, we review de novo the district court's conclusions of law and review for clear error any factual determinations. *Id*. "We have held that these standards 'are not in fact inconsistent, because it is an abuse of discretion to make errors of law or clear errors of factual determination.'" *Id*. (internal quotation omitted).

### 2. Analysis

Turner argues that there were several errors that, when combined, warrant vacating his sentence and retrying him. We conclude that any errors were harmless and do not, even in combination, warrant a retrial.

"A constitutional error is harmless when it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Esparza*, 540 U.S. at 17-18 (internal quotation marks omitted). As the Supreme Court held in *Kotteakos v. United States*, 328 U.S. 750

14

(1946), "if one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Id*. at 765. *See Haywood*, 280 F.3d at 724 (applying this standard in the criminal context). An error may be harmless if the contested evidence was already properly admitted through other witnesses. *United States v. Sprouts*, 282 F.3d 1037, 1044 (6th Cir. 2002). Although some errors may be harmless in isolation, a combination of such errors may be so prejudicial as to warrant a new trial for the defendant. *United States v. Parker*, 997 F.2d 219, 222 (6th Cir. 1993); *United States v. Hines*, 398 F.3d 713, 719 (6th Cir. 2005).

### a. Denial of Motion for Mistrial After Officer Ray's Testimony

First, Turner appeals the district court's denial of his motion for a mistrial after Ray testified that officers found marijuana in Smith-Knight's vehicle during their search. The district court held that the information was not sufficiently prejudicial to warrant a mistrial, and that the situation could be ameliorated by (1) a leading question aimed at establishing that the marijuana had no relevance to the case and (2) a curative instruction by the district court. We consider five factors when determining if certain statements warrant granting a mistrial:

> (1) whether the remark was unsolicited, (2) whether the government's line of questioning was reasonable, (3) whether a limiting instruction was immediate, clear, and forceful, (4) whether any bad faith was evidenced by the government, and (5) whether the remark was only a small part of the evidence against the defendant.

*Caver*, 470 F.3d at 243 (quoting *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003)). When engaging in this analysis, "'the primary concern is fairness to the defendant.'" *Id*. (quotation omitted). To minimize any possible unfair prejudice to the defendant, the district court may give a limiting

15

instruction to the jury regarding the appropriate use of the evidence presented. *United States v. Foster*, 376 F.3d 577, 592 (6th Cir.), *cert. denied*, 543 U.S. 1012 (2004).

We conclude that the district court did not abuse its discretion by denying Turner's motion for a mistrial. The five factors laid out by *Caver* do not weigh in favor of granting a mistrial based on Ray's testimony. We address each factor in turn. First, Ray could have answered the question posed by the prosecutor without mentioning marijuana. Indeed, after Ray's answer and the defense counsel's objection, the prosecutor immediately asked for a limiting instruction. The district court found that this was "a slip on the part of this officer." J.A. at 569 (2-199:178-19). Because our reading of the record causes us to agree with the district court that Ray's statement was unsolicited, we conclude that the district court's factual finding (that this was a "slip") is not clearly erroneous. Second, the prosecutor's line of questioning was reasonably related to discovering the relevant items found during the search. Third, the district court crafted a strategy for approaching the jury: both a leading question by the prosecutor to clarify and an immediate limiting instruction. Fourth, because the district court found this to be a "slip," J.A. at 569 (2-199:178-19), it did not consider this to be evidence of bad faith on the part of the government. Again, because the record does not reveal the district court's finding to be clear error, we conclude that the government did not act in bad faith. Finally, Ray's statement regarding the marijuana was not related to this case; despite the fact that it was prejudicial to the defendant to be associated with illegal drugs, ample other evidence clearly weighed heavily against the defendant. Based on the foregoing, we conclude that the district court did not abuse its discretion by denying Turner's motion for mistrial after Ray's testimony connected him with an illegal substance, marijuana.

16

### b. Officer McDaniel's Testimony

Next, Turner argues that the district court should have barred McDaniel's testimony about the background of the robbery investigation under FED. R. EVID. 403; he argues that the statements made by McDaniel were "of little probative value when balanced against the obvious prejudice" to him. Appellant Br. at 29. The district court found that McDaniel's statements were not hearsay, and that his testimony was properly admitted under Rule 403 because it was not more prejudicial than probative. Turner concedes in his brief that the district court's determination that McDaniel's statements did not constitute hearsay was not clearly erroroneous. *See* Appellant Br. at 28-29; *Caver*, 470 F.3d at 239. As a result of this concession, our focus turns to whether the statements were more unfairly prejudicial than probative under Rule 403.

Our precedent states that "[b]ackground information that explains how law enforcement came to be involved with a particular defendant is not hearsay, because it is not being offered for the truth of the matter asserted." *Caver*, 470 F.3d at 239 (citation omitted); *United States v. Evans*, 883 F.2d 496, 501 (6th Cir. 1989). "'When inculpatory out of court assertions name the criminal defendant in connection with 'setting the scene' for an investigation, the question of unfair prejudice under Rule 403 of the Federal Rules of Evidence almost always arises." *United States v. Pulley*, 922 F.2d 1283, 1288 (6th Cir. 1991) (quotation marks omitted). Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. We have previously held that "'[t]he relevance and probative value of 'investigative background' is often low, but the potential for abuse is high.'" *Pulley*, 922 F.2d at 1288 (quotation omitted). However, "when

17

reviewing the balancing determinations required by Rule 403, this court must maximize the probative value of the challenged evidence and minimize its potential for unfair prejudice." *United States v. Lloyd*, 462 F.3d 510, 516 (6th Cir. 2006).

We conclude that the district court did not abuse its discretion by admitting McDaniel's testimony because the testimony was not more unfairly prejudicial than probative and thus Rule 403 was not violated. Defense counsel's opening statement began with a description of the bank robbery for which Turner was being tried and stated explicitly that another individual, Artie Ware ("Ware"), was responsible. Defense counsel emphasized during his opening statement that, despite all of the fingerprint evidence that was found, the police never tested to see if the prints matched those of Ware. To address the issue of whether Ware—not Turner—was the proper suspect, the government sought to introduce testimony by McDaniel about the development of the robbery investigation. In sidebar conferences with the district court during the testimony of McDaniel, the government stated that it would "gladly agree" to a limiting instruction that explained that McDaniel's testimony was "not being offered," J.A. at 538 (Trial Tr. at 2-168:1-7), to prove that the physical characteristics of the robber matched those of Turner; indeed, the government believed the fact that the physical characteristics of the robber matched those of Turner had been (and would be) shown by *other* witnesses. McDaniel testified that the initial suspect was Ware; however, because the physical description of Ware did not match the physical descriptions given by the witnesses, attention turned to Turner.

As in *Pulley*, the testimony offered by McDaniel touched upon a key issue regarding allegedly improper investigatory methods in the case: had the police focused on the correct suspect? The fact that McDaniel testified directly that Turner matched the witnesses' descriptions of the

18

robber's tattoo and age is troubling; the government could have achieved its purpose by explaining how officers eliminated Ware as a suspect without mentioning that Turner matched the description provided by witnesses. However, even if we were to believe that Rule 403 were violated, any error stemming from McDaniel's testimony was harmless because previous witnesses had testified about the robber's tattoo and approximate age, and Turner's tattoo and approximate age were apparent to the jury as he sat through the trial. *See United States v. Powers*, 500 F.3d 500, 510 (6th Cir. 2007) (holding as harmless error admission of testimony deemed more detailed than necessary to establish "context"). Two bank employees, Fisher and Kaddoura, testified that the robber had a tattoo under one eye. One of Turner's friends, Lisa Donald ("Donald") testified that Turner had a tattoo near his right eye; she also testified that Ware, with whom she had had a relationship, did not have facial tattoos. In addition, Angus, another bank employee, testified that the bank robber was approximately twenty years old.

Based on the foregoing, we conclude that the district court did not abuse its discretion by admitting McDaniel's testimony. Even if the scope of McDaniel's testimony was greater than necessary to achieve the government's purpose, any error was harmless because the jurors heard other testimony about Turner's physical attributes from other witnesses and could observe him for themselves in the courtroom. In addition, because of the weight of the other evidence against Turner, it could not be said that McDaniel's statements substantially swayed the jury to convict Turner.

### c. Bank Investigator's Report

Finally, we consider Turner's argument that the district court erred by admitting the report of, and testimony by, the bank investigator detailing the denominations of the money missing from the bank. As we stated above, an error may be harmless if the contested evidence was already

19

properly admitted through other witnesses. *Sprouts*, 282 F.3d at 1044. We conclude that, even if it was error to admit the report and testimony by the bank investigator detailing the denominations of the missing money, any error was harmless because several witnesses testified as to the denominations for which Turner asked and was given. Three bank employee witnesses—Fisher, Crone, and Kaddoura—testified that Turner asked for fifty and one-hundred dollar bills. Because three witnesses gave testimony about the denominations of money demanded and received by Turner prior to that of the bank investigator, any error in admitting the bank investigator's testimony was harmless.

### d. Cumulative Effect

Having analyzed each of the alleged errors above, we must now consider their cumulative effect. We have held that "the cumulative effect of individual errors may result in a trial setting that is fundamentally unfair." *Hines*, 398 F.3d at 719. In this case, one of the alleged errors—the denial of the motion for mistrial—was not an error, and the other alleged errors—the admission of McDaniel's testimony and the bank investigator's testimony and report—were at most harmless errors. We conclude that the cumulative effect of the admission of McDaniel's testimony and the bank investigator's testimony and report did not lead to a "fundamentally unfair" trial, *Hines*, 398 F.3d at 719, because the information revealed by these sources was also presented by other witnesses during the trial. The cumulative effect of these (at most) harmless errors was not "so prejudicial as to warrant a new trial." *Parker*, 997 F.2d at 222.

20

**D. Motion for Judgment of Acquittal**

### 1. Standard of Review

We review de novo a district court's denial of a motion for judgment of acquittal, and we affirm the district court's decision "if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Solorio*, 337 F.3d 580, 588 (6th Cir. 2003) (internal quotation marks omitted). Defendants bear a heavy burden in attempting to show that the evidence used to convict them was insufficient. *United States v. White*, 492 F.3d 380, 393 (6th Cir. 2007).

### 2. Analysis

On appeal, Turner argues that there was insufficient evidence to support his conviction for bank robbery because none of the witnesses "clearly identif[ied] [him] as the robber." Appellant Br. at 35. However, there is no requirement under the law that a witness see the robber and identify him or her; circumstantial evidence alone may be sufficient to sustain a conviction. *United States v. Blackwell*, 459 F.3d 739, 760 (6th Cir. 2006). Thus, there is no need for a witness to have specifically identified Turner as the robber in this case in order to sustain his conviction. Accordingly, in light of the ample evidence presented by the government in this case, we hold that the district court properly denied Turner's motion for judgment of acquittal.

## III. CONCLUSION

First, we hold that, because the jacket and money found in one of the jacket's pockets were only a small part of the circumstantial evidence that the jury could have used to find Turner guilty, even if the district court erred by denying Turner's motion to suppress the jacket and money found within it, any such error was harmless. Second, we hold that, because the boot-print evidence was

not material exculpatory evidence and was not destroyed in bad faith by the government, the district court properly denied Turner's motion to exclude this evidence. Also, we conclude that the district court properly denied Turner's motion to exclude the boot-print analysis because the government expert's testimony regarding boot-print analysis met the requirements of *Daubert* and FED. R. EVID. 702. Third, we hold that each of the alleged trial errors were at most harmless error, and even their cumulative effect did not render the trial fundamentally unfair. Finally, because the circumstantial evidence presented at trial was sufficient to support the jury's verdict, we hold that the district court properly denied Turner's motion for judgment of acquittal. Therefore, we **AFFIRM** the district court's judgment.